Sexual Abuse: A Journal of
Research and Treatment
Volume 21 Number 3
September 2009 279-307
© 2009 Association for the
Treatment of Sexual Abusers
10.1177/1079063209338490
http://sajrt.sagepub.com
hosted at
http://online.sagepub.com

# The Impact of Prison-Based Treatment on Sex Offender Recidivism

## Evidence From Minnesota

Grant Duwe
*Minnesota Department of Corrections, St. Paul*
Robin A. Goldman
*Minnesota Department of Corrections, Lino Lakes*

Using a retrospective quasi-experimental design, this study evaluates the effectiveness of prison-based treatment by examining recidivism outcomes among 2,040 sex offenders released from Minnesota prisons between 1990 and 2003 (average follow-up period of 9.3 years). To reduce observed selection bias, the authors used propensity score matching to create a comparison group of 1,020 untreated sex offenders who were not significantly different from the 1,020 treated offenders. In addition, intent-to-treat analyses and the Rosenbaum bounds method were used to test the sensitivity of the findings to treatment refuser and unobserved selection bias. Results from the Cox regression analyses revealed that participating in treatment significantly reduced the hazard ratio for rearrest by 27% for sexual recidivism, 18% for violent recidivism, and 12% for general recidivism. These findings are consistent with the growing body of research supporting the effectiveness of cognitive–behavioral treatment for sex offenders.

*Keywords:* sex offender; treatment; prison; recidivism; propensity score matching

Over the past 50 years, dozens of studies from a number of countries have examined whether sex offender treatment reduces recidivism. Reviews of the earliest studies drew pessimistic conclusions about the effectiveness of treatment. For example, in their 1989 review of the treatment literature, Furby, Weinrott, and Blackshaw argued that, due to methodological shortcomings, there was insufficient evidence to support the notion that treatment decreases sex offender recidivism. Several years later, Quinsey, Harris, Rice, and Lalumiere (1993) reached a similar conclusion in their review of existing treatment studies.

---

**Authors' Note:** The views expressed in this study are not necessarily those of the Minnesota Department of Corrections. The authors wish to thank Karl Hanson and the three anonymous reviewers for their very helpful comments on earlier drafts of this study. Please address correspondence to Grant Duwe, PhD, Minnesota Department of Corrections, 1450 Energy Park Drive, Suite 200, St. Paul, MN 55108-5219; e-mail: GDuwe@co.doc.state.mn.us.

Case 3:15-cr-00093   Document 98-1   Filed 04/04/18   Page 1 of 29 PageID #: 375

Since the mid-1990s, however, meta-analyses of the treatment literature have, with a few notable exceptions (Kenworthy, Adams, Brooks-Gordon, & Fenton, 2004; Rice & Harris, 2003), found lower sexual recidivism rates for treated sex offenders in comparison with untreated offenders (Alexander, 1999; Gallagher, Wilson, Hirschfield, Coggeshall, & MacKenzie, 1999; Hall, 1995; Hanson et al., 2002; Lösel & Schmucker, 2005). Among the meta-analyses that have found a treatment effect, the rate of sexual reoffense has been between 5 and 10 percentage points less for those who participated in treatment, resulting in a mean effect size (Cohen's $d$) ranging from .12 to .47. The evidence from these studies further indicates that cognitive–behavioral techniques with relapse prevention components have, by and large, been found to be the most effective in reducing recidivism.

Despite the generally positive findings from the meta-analytical reviews, it is nevertheless true that most of the existing treatment studies have lacked methodological rigor. In the Lösel and Schmucker (2005) study, which is the most comprehensive meta-analysis to date, 80 comparisons (69 studies) between treated and untreated sex offenders were examined. Of these comparisons, only 6 (7%) used a randomized experimental design—most notably, the research by Marques and colleagues (Marques, 1999; Marques, Day, Nelson, & West, 1994; Marques, Wiederanders, Day, Nelson & von Ommeren, 2005)—whereas 7 (9%) used individual matching or statistical control in an effort to achieve equivalence between the treatment and comparison groups. Instead, most treatment studies have used either nonequivalent comparison groups (60%) or research designs in which equivalence was assumed between the treated and untreated groups (24%).

Given the relatively large percentage (84%) of studies that have not used random assignment or matching techniques, selection bias is, as some have pointed out (Harkins & Beech, 2007; Jones, Pelissier, & Klein-Saffran, 2006; Rice & Harris, 2003), a problem that has plagued the sex offender treatment literature. In evaluations of treatment effectiveness, selection bias refers to differences—both observable and unobservable—between the treated and untreated groups that make it difficult to determine whether the observed effects are due to the treatment itself or to the different group compositions. Therefore, although previous evaluations have found that recidivism rates are generally reduced for sex offenders who participate in treatment, this effect may not necessarily be due to the treatment itself but rather to other differences between treated and untreated offenders.

In addition to selection bias, the vast majority of existing studies share a number of limitations. For example, of the studies reviewed by Lösel and Schmucker (2005), only 11 (13%) had a sample size in excess of 500. Moreover, the follow-up periods for many studies have been relatively short, as only one fourth of those examined by Lösel and Schmucker tracked offenders for more than 7 years.

## Present Study

In evaluating the effectiveness of sex offender treatment in Minnesota prisons, this study does not use a randomized experimental design. Furthermore, due to a

lack of available data, it does not control for the possible impact that postrelease participation in community-based treatment may have on reoffending. Despite these limitations, however, the present study contains a number of strengths that have been lacking from most prior treatment studies. First, as discussed later in more detail, we used propensity score matching (PSM) to individually match treated and untreated sex offenders. In doing so, this study minimizes the threat of selection bias by creating a comparison group whose probability of entering treatment was similar to that of the treatment group. Second, in addition to being one of the first studies in the sex offender treatment literature to use PSM (Caldwell, Skeem, Salekin, & Van Rybroek, 2006; Skeem, Monahan, & Mulvey, 2002), this study further controls for rival causal factors by analyzing the data with Cox regression, which is widely regarded as the most appropriate multivariate statistical technique for recidivism analyses. Third, by comparing 1,020 treated sex offenders with a matched group of 1,020 untreated sex offenders, the sample size used for this study ($N = 2,040$) is one of the larger sex offender treatment studies to date. Fourth, to gain a more precise assessment of the effectiveness of treatment, we used multiple measures of treatment participation and criminal recidivism. Finally, because recidivism data were collected on the 2,040 sex offenders through the end of 2006, the average follow-up period for these offenders was 9.3 years. This study thus provides a robust assessment of treatment effectiveness by tracking offenders over a relatively lengthy period of time.

In examining prison-based treatment in Minnesota, we attempt to address several questions central to the sex offender treatment literature. First, does treatment participation reduce offender recidivism? Second, what effect does treatment outcome (i.e., dropout, complete, successfully participate until release, etc.) have on reoffending? Finally, are there certain types of sex offenders for whom treatment is more effective?

In the following section, we describe the provision of sex offender treatment within the Minnesota Department of Corrections (MNDOC). The data and methods used in this study are then discussed, followed by a presentation of the results. We conclude by discussing the implications of the findings for the sex offender treatment literature.

## Program Description: Sex Offender Treatment in the MNDOC

In 1978, the MNDOC began providing sex offender treatment to incarcerated adult men when it opened the Transitional Sex Offender Treatment Program (SOTP)—a 30-bed program for offenders preparing to return to the community—at the Minnesota Correctional Facility (MCF) at Lino Lakes. Consistent with the name of the program, offenders were treated in the last year of their incarceration and the emphasis was on preparation for release. As a component of the program design,

services were continued for men postrelease in a half-way house setting in conjunction with the staff of the half-way house.

In 1983, a second prison-based sex offender treatment program was established at MCF–Oak Park Heights, Minnesota's lone maximum custody facility. In addition to providing sex offender treatment, this 52-bed program treated chemically dependent inmates as well as those with dual diagnoses (i.e., needing treatment for both chemical dependency and sexual offending). In 1994, this program relocated to the medium custody facility, MCF–Lino Lakes, and eventually integrated with the original SOTP, which had grown and evolved since 1978.

In 1991, the Sexual Education and Evaluation Center, a small (36-bed) sex offender treatment program opened at MCF–Stillwater. Psychoeducation and therapy groups were the primary services offered by this program, which was designed to provide a short-term but intensive treatment experience. Three years later, a 50-bed sex offender treatment program opened at MCF–Moose Lake. Designed to provide long-term intensive sex offender treatment, this program also offered some specialized groups for offenders with intellectual or cognitive deficits.

Due to prison population growth and increased sentence lengths for sex offenders, the size of the program at the MCF–Lino Lakes increased to 110 beds by 1997 and then further expanded to 150, when the Sexual Education and Evaluation Center program was transferred to MCF–Lino Lakes and integrated with the program at that site. In 2000, it expanded once again with the transfer and integration of the MCF–Moose Lake program to MCF–Lino Lakes.

Over the past three decades, sex offender treatment programming at MCF–Lino Lakes evolved to keep pace with changing practices in the field, while attempting to maintain the most unique and seemingly valuable components of each of the programs that were melded into the program that exists today. For example, the chemical dependency (CD) treatment component was maintained. In doing so, the SOTP addressed the chemical abuse issues, and their relationship to sexual offending, in a more integrated manner than would likely occur in a standalone CD treatment program. In addition, psychoeducation classes and therapy designed to accommodate the needs of the offender with intellectual or cognitive functioning limitations were maintained. Moreover, the number and variety of psychoeducation classes designed to impart information and enhance skill building were expanded at the SOTP. Finally, an emphasis on preparation for release was also maintained.

Using a cognitive–behavioral framework, the SOTP attempted to provide long-term intensive sex offender and CD treatment consistent with a risk-needs-responsivity model. To be eligible for treatment, offenders had to have at least 9 months to serve in prison. Moreover, offenders who minimized their offenses (as described in official documents) were eligible to enter treatment in the MNDOC; whereas those who completely denied committing a sexual offense were not eligible. Given the fact that treatment capacity did not keep pace with the overall growth in inmate population, the SOTP attempted to target moderate- to high-risk sex offenders for treatment.

Offenders considered to be lower risk were less likely to be admitted to sex offender treatment programming while incarcerated. However, offenders required to enter treatment but who were unable to do so while incarcerated were recommended to participate in community-based treatment at the time of release.

Under the current process, offenders are prioritized for treatment primarily on the basis of their scores from the following actuarial instruments: Static-99, Rapid Risk Assessment for Sex Offense Recidivism, and Minnesota Sex Offender Screening Tool–Revised. Earlier attempts, however, to identify and prioritize cases for treatment were based on more primitive tools such as the Public Risk Monitoring (PRM) criteria, which were developed by MNDOC staff. Offenders who met the PRM criteria, which were never formally validated on the sex offender population, were directed to participate in treatment programming. As shown later, the PRM criteria did not appear to be very effective in distinguishing offenders on the basis of recidivism risk. Indeed, the recidivism risk (as reflected by the risk score measure developed for this study) was not significantly different between offenders who were offered treatment and those who were not.

After receiving a treatment directive, offenders had the right to refuse treatment. There were consequences, however, for those who exercised this right. In particular, offenders who failed to comply with a treatment directive had their wages frozen and were subject to extended incarceration disciplinary time that lengthened their stay in prison. In addition, treatment participation and outcome is an item on the Minnesota Sex Offender Screening Tool–Revised, which has been used to guide decisions regarding community notification levels and civil commitment referral. Therefore, even though offenders can refuse the directive to enter treatment, the "carrot-and-stick" approach used by the MNDOC likely motivated many offenders to enter treatment programming who might have otherwise opted not to do so if the choice were entirely voluntary.

SOTP participants were housed in two adjacent wings of a larger living unit. This arrangement allowed for some movement across the wings in the living unit but no movement either to, or from, the other wings where the general population inmates were housed. The living units operated within a modified therapeutic milieu with clear living unit/program structure and rules, and there was an expectation that inmates will support and hold one another accountable throughout their day. The SOTP was not an entirely closed living unit, as there was some interaction with the general inmate population during movement and activities such as dining, religious services, educational programming, and so on. A 30-day assessment and orientation phase, individual and group therapy, and psychoeducational programming were held next to the living unit in two buildings, where the offices of clinical staff were also located. Although individualized treatment plans varied widely among treatment participants, the average dosage consisted of approximately 10 to 15 hours of direct staff facilitated services per week for a duration that often ranged from 1 to 3 years.

In 1999, the MNDOC implemented legislatively mandated rules for residential sex offender treatment that require programs to meet specified staff training and ratios, group and class size limitations, have a written theory-based treatment protocol, and demonstrate that that they apply this to their assessment, treatment, and therapeutic milieu. The program was audited on a biannual basis. Given the state of research and practice in the field of sex offender treatment, the SOTP continues to be a work in progress. The following section describes the main components of the program.

## SOTP Components

*Assessment.* This 30-day phase of the program includes psychological testing, completion of assignments to facilitate the assessment of treatment needs, a review of offending history and offense dynamics, and use of lecture, discussion, and videotapes to provide information on treatment participation and expectations, defenses and denial, sexual assault dynamics, victim impact, CD, and so on. A clinical interview, collateral information, client observations, and test results were used to develop a written psychosexual assessment report and an individualized treatment plan.

*Therapy.* Following the assessment phase of the program, inmates participated in an average of 6 hours per week of staff-facilitated group therapy sessions. Therapy groups specific to the needs of the inmate with cognitive/intellectual limitations were provided. Additional individual therapy was offered based on the needs of the inmate and the availability of staff. Therapy was provided in progressive phases and included transitional programming and aftercare. Ongoing therapy and postrelease programming in the community was provided under contract with, or through, grants from the MNDOC to private agencies.

*CD treatment.* Offenders entering the MNDOC were formally screened, assessed, and diagnosed for chemical abuse or CD. Treatment directives were provided contingent on the outcome of these assessments. For those sex offenders needing treatment for alcohol or drug dependency, CD treatment was typically provided following completion of the Assessment Phase in the SOTP.

*Family/support person education.* To prepare offenders for their return to the community, while also helping them reach specific treatment goals, education sessions were facilitated between program participants and members of their family and/or support system. These sessions were used to provide clarification about the nature and impact of their offending, to inform support persons about the risk for reoffense, and to identify response strategies for the offender and the support person.

*Psychoeducational programming.* Program members participated in psychoeducational programming, which varied according to the offender's individualized

treatment plan. Psychoeducational classes were typically provided for 1.5-hour sessions 3 to 4 times per week in 12-week (quarter) sessions. Each quarter, program participants were each enrolled in one or two classes, which included Emotions Management, Alcohol and Drug Education, Cognitive Restructuring and Criminal Thinking, Sexuality Education, Sexual Assault Dynamics, Reoffense Prevention, Victim Empathy, Personal Victimization, Grief and Loss, Morals and Values, Sexual Behaviors, and Transitional Curriculum. Classes specific to the needs of the inmate with cognitive limitations included modifications of some of the classes above.

In addition to these psychoeducational classes, offenders were assigned, per their individual treatment plan, to participate in a parenting class provided in the institution under a contract with a nonprofit agency. Offenders in the program also participated in additional educational, prerelease, and transitional planning (housing, employment, transportation, etc.), which drew heavily on resources from the community.

*Support groups.* On a weekly basis, offenders attended additional support groups such as Alcoholics Anonymous, Narcotics Anonymous, and Sex Abusers Anonymous meetings held in the institution. Each of these groups met for 1.5 hours per week and were monitored, but not facilitated, by program staff.

*Community meetings.* Inmates met weekly in a large group with other members of their living unit to address general housekeeping issues, community milieu, and to provide support to one another as a community.

## Data and Methodology

To determine whether treatment provided within the MNDOC has had an impact on sex offender recidivism, we used a retrospective quasi-experimental design. That is, we evaluated the effectiveness of sex offender treatment by comparing recidivism outcomes between treated offenders and a matched comparison group of untreated offenders who were released between 1990 and 2003. During this 14-year period, there were 3,440 sex offenders who were released from Minnesota prisons.

Of these offenders, 1,493 (43%) participated in prison-based treatment prior to their release from prison. Of the remaining 1,947 offenders, 105 refused to enter treatment whereas the other 1,842 offenders were not given the opportunity to participate. Because the 105 treatment refusers did not participate in treatment, we removed these offenders from the study so as not to bias the results from the statistical analyses. Before doing so, however, we attempted to remove an additional source of bias by using PSM to identify a comparison group of 105 offenders from the pool of untreated offenders ($N = 1,842$) who were not offered treatment.

## Propensity Score Matching

PSM is a method that estimates the conditional probability of selection to a particular treatment or group given a vector of observed covariates (Rosenbaum & Rubin, 1984). The predicted probability of selection, or propensity score, is typically generated by estimating a logistic regression model in which assignment (0 = *no assignment*; 1 = *assignment*) is the dependent variable whereas the predictor variables consist of those that theoretically have an impact on the selection process. Shadish, Cook, and Campbell (2002) note that unless the predictors are unrelated to the outcome variable or are not proper covariates, they should be included in the propensity score model even if they are only weakly associated with the outcome (recidivism for this study). Once estimated, the propensity scores are then used to match individuals who entered treatment (or refused to enter treatment) with those who did not. Thus, one of the main advantages with using PSM is that it can simultaneously "balance" multiple covariates on the basis of a single composite score. Although there are a number of different matching methods available, we used a "greedy" matching procedure that used a without-replacement method in which treated offenders were matched to untreated offenders who had the closest propensity score (i.e., "nearest neighbor") within a caliper (i.e., range of propensity scores) of .10 (defined in terms of probabilities).

In matching untreated offenders with treated offenders on the conditional probability of entering treatment, PSM reduces selection bias by creating a counterfactual estimate of what would have happened to the treated offenders had they not participated in treatment. PSM is not without its limitations, however. First, and foremost, because propensity scores are based on observed covariates, PSM is not robust against "hidden bias" from unmeasured variables that are associated with both the assignment to treatment and the outcome variable. Second, there must be substantial overlap among propensity scores between the two groups for PSM to be effective (Shadish et al., 2002); otherwise, the matching process will yield incomplete or inexact matches. Finally, as Rubin (1997) points out, PSM tends to work best with large samples.

Although somewhat limited by the data available to us, we attempted to address potential concerns over unobserved bias by including as many theoretically relevant covariates (17) as possible in our propensity score models. More important, however, we conducted Rosenbaum bounds sensitivity analyses to evaluate the extent to which the treatment effects obtained are robust to the possibility of hidden bias. In addition, we later demonstrate that there was substantial overlap in propensity scores between the treated and untreated offenders. Furthermore, we addressed the sample size limitation by assembling a relatively large number of cases ($N = 3,440$) on which to conduct the propensity score analyses.

*Matching treatment refusers and nonrefusers.* In an effort to minimize the bias resulting from treatment refusers, we attempted to identify a comparison group of

untreated offenders who were not offered treatment in order to remove these offenders from the comparison group pool. We computed propensity scores for the 105 treatment refusers and the 1,842 untreated offenders by estimating a logistic regression model in which the dependent variable was refusal of treatment (i.e., the 105 treatment refusers were assigned a value of "1," whereas the 1,842 untreated offenders in the comparison group pool received a value of "0"). The predictors were the 17 control variables, which are described later, that were used in the statistical analyses. After obtaining propensity scores on the 1,947 offenders, we used the greedy matching procedure to match 105 untreated offenders not offered treatment with the 105 treatment refusers.

In Table 1, we present the covariate, propensity score, and recidivism outcome means for both groups prior to matching ("total") and after matching ("matched"). In addition to tests of statistical significance ("$t$ test $p$ value"), we provide a measure ("Bias") developed by Rosenbaum and Rubin (1985) that quantifies the amount of bias between the treatment and control samples (i.e., standardized mean difference between samples),

$$\text{Bias} = \frac{100(\overline{X}_t - \overline{X}_c)}{\sqrt{(S_t^2 + S_c^2)/2}}$$

where $\overline{X}_t$ and $S_T^2$ represent the sample mean and variance for the treated offenders and $\overline{X}_c$ and $S_c^2$ represent the sample mean and variance for the untreated offenders. If the value of this statistic exceeds 20, the covariate is considered to be unbalanced (Rosenbaum & Rubin, 1985).

As shown in Table 1, the matching procedure reduced the bias in propensity scores between treatment refusers and those not offered treatment by 99%. Whereas the $p$ value was .00 in the unmatched sample, it was .95 in the matched sample. Although risk score was not used as a predictor in the logistic regression analysis, we also present the means for this variable to illustrate the differences between the two groups before and after matching. In the unmatched sample, there were nine covariates that were significantly imbalanced (i.e., the difference between the treatment refusers and those not offered treatment was significant at the .05 level and the bias values exceeded 20). But in the matched sample, covariate balance was achieved insofar as there were no covariates with bias values greater than 20 or with significant differences between the treatment refusers and those not given a treatment opportunity. Just as important, when examining the outcome data for these two groups of offenders within the unmatched sample, we see that treatment refusers had significantly higher rates of sexual and violent recidivism. In the matched sample, however, recidivism outcomes were not significantly different between the two groups. Along with the 105 treatment refusers, we removed the 105 matched offenders not offered treatment from the remaining analyses. In doing so, we reduced the number of untreated offenders in the comparison group pool by 210 from 1,947 to 1,737.

**Table 1**
**Propensity Score Matching and Covariate Balance for Refusers**

| Variable | Sample | Refusers Mean | Nonrefusers Mean | Bias (%) | Bias Reduction | t Test p Value |
|---|---|---|---|---|---|---|
| Propensity score | Total | 0.11 | 0.05 | 53.25 | | .00 |
| | Matched | 0.11 | 0.11 | 0.76 | −98.58% | .95 |
| Minority | Total | 38.10% | 37.79% | 0.52 | | .95 |
| | Matched | 38.10% | 39.05% | 1.59 | 205.38% | .89 |
| Age at release (years) | Total | 32.89 | 33.04 | 1.08 | | .89 |
| | Matched | 32.89 | 32.84 | 0.37 | −65.72% | .98 |
| Metro | Total | 49.52% | 45.44% | 6.66 | | .41 |
| | Matched | 49.52% | 59.05% | 15.58 | 134.05% | .17 |
| Prior sex crimes | Total | 41.90% | 20.20% | 37.98 | | .00 |
| | Matched | 41.90% | 44.76% | 4.70 | −87.64% | .68 |
| Prior felony | Total | 68.57% | 63.79% | 8.28 | | .32 |
| | Matched | 68.57% | 66.67% | 3.31 | −60.04% | .77 |
| Stranger | Total | 10.48% | 9.50% | 2.64 | | .74 |
| | Matched | 10.48% | 12.38% | 4.91 | 85.96% | .67 |
| Acquaintance | Total | 66.67% | 60.42% | 10.66 | | .20 |
| | Matched | 66.67% | 64.76% | 3.28 | −69.24% | .77 |
| Adult female | Total | 16.19% | 18.78% | 5.61 | | .51 |
| | Matched | 16.19% | 14.29% | 4.26 | −24.02% | .70 |
| Male child | Total | 3.81% | 5.54% | 6.89 | | .45 |
| | Matched | 3.81% | 1.90% | 8.86 | 28.51% | .41 |
| Length of stay (months) | Total | 29.13 | 23.65 | 15.43 | | .01 |
| | Matched | 29.13 | 29.24 | 0.28 | −98.18% | .98 |
| Discipline | Total | 1.38 | 1.45 | 2.30 | | .82 |
| | Matched | 1.38 | 1.13 | 10.90 | 374.76% | .32 |
| Supervision (months) | Total | 50.58 | 34.17 | 42.00 | | .00 |
| | Matched | 50.58 | 43.33 | 18.00 | −57.13% | .11 |
| Intensive supervised release | Total | 32.38% | 18.19% | 26.10 | | .00 |
| | Matched | 32.38% | 24.76% | 13.58 | −47.99% | .22 |
| Supervised release | Total | 61.90% | 79.59% | 31.30 | | .00 |
| | Matched | 61.90% | 70.48% | 14.65 | −53.19% | .19 |
| Supervised release revocations | Total | 1.34 | 0.76 | 34.69 | | .00 |
| | Matched | 1.34 | 1.36 | 0.89 | −97.42% | .93 |
| Community notification | Total | 14.30% | 2.40% | 32.33 | | .00 |
| | Matched | 14.30% | 14.30% | 0.00 | −100.00% | 1.00 |
| Release year | Total | 1998.61 | 1996.93 | 32.13 | | .00 |
| | Matched | 1998.61 | 1997.76 | 16.02 | −50.14% | .16 |
| Risk score | Total | 4.39 | 3.95 | 19.80 | | .02 |
| | Matched | 4.39 | 4.32 | 3.16 | −84.05% | .78 |
| Total recidivism | Total | | | | | |
| | Matched | | | | | |
| Sex rearrest | Total | 41.0% | 16.1% | | | .00 |
| | Matched | 41.0% | 36.2% | | | .48 |
| Violent rearrest | Total | 55.2% | 33.6% | | | .00 |
| | Matched | 55.2% | 47.6% | | | .27 |
| Any rearrest | Total | 66.7% | 59.8% | | | .16 |
| | Matched | 66.7% | 69.5% | | | .66 |

Note: Total refusers, $N = 105$; total nonrefusers, $N = 1,842$; matched refusers, $N = 105$; matched nonrefusers, $N = 105$.

**Table 2**
**Logistic Regression Model for Assignment to Treatment**

| Predictors | Coefficient | Standard Error |
|---|---|---|
| Minority | −0.292** | 0.088 |
| Age at release (years) | 9.0E-4* | 3.9E-4 |
| Metro | 0.290** | 0.081 |
| Prior sex crime convictions | 0.789** | 0.095 |
| Prior felony convictions | −0.348** | 0.082 |
| Stranger victims | −0.048 | 0.153 |
| Acquaintance victims | −0.039 | 0.089 |
| Adult Female victims | −0.093 | 0.106 |
| Male child victims | 0.145 | 0.160 |
| Length of stay (months) | 0.021** | 2.0E-4 |
| Discipline | −0.076** | 0.019 |
| Supervision (months) | 6.5E-4** | 1.6E-4 |
| Intensive supervised release | 0.980** | 0.368 |
| Supervised release | 0.902* | 0.358 |
| Supervised release revocations | 0.160** | 0.033 |
| Community notification | 0.703** | 0.238 |
| Release year | −0.017 | 0.014 |
| Constant | 31.997 | 27.806 |
| $N$ | 3,230 | |
| Log-likelihood | 3929.875 | |
| Nagelkerke $R^2$ | .202 | |

$*p < .05. **p < .01.$

*Matching treated and untreated sex offenders.* Similar to the approach described above with treatment refusers, we calculated propensity scores for the 1,493 treated offenders and the 1,737 untreated offenders by estimating a logistic regression model in which the dependent variable was participation in prison-based treatment (i.e., the 1,493 group offenders were assigned a value of "1," whereas the 1,737 offenders in the comparison group pool received a value of "0"). The predictors were the 17 control variables (excluding risk score) used in the statistical analyses (see Table 2). As shown in Figure 1, there was substantial overlap in propensity scores between the treated and untreated offenders, even though the difference in mean propensity score was statistically significant at the .01 level (see Table 3).

After obtaining propensity scores for the 3,230 offenders, we used the greedy matching procedure to match the untreated offenders with the treated offenders. Because the matching process is often a trade-off between the size of the bias reduction and the proportion of cases that can be matched (DiPrete & Gangl, 2004), especially in situations like this one where the treated offenders ($N = 1,493$) accounted for nearly half (46%) of the offenders ($N = 3,230$), we were unable to

Case 3:15-cr-00093    Document 98-1    Filed 04/04/18    Page 11 of 29 PageID #: 385

## Table 3
## Propensity Score Matching and Covariate Balance for Treatment

| Variable | Sample | Treated Mean | SD | Untreated Mean | SD | Bias (%) | Bias Reduction | t Test p Value |
|---|---|---|---|---|---|---|---|---|
| Propensity score | Total | 0.55 | 0.19 | 0.39 | 0.17 | 70.31 | | .00 |
| | Matched | 0.47 | 0.17 | 0.47 | 0.17 | 1.19 | −98.30% | .74 |
| Minority | Total | 33.09% | 0.47 | 37.71% | 0.48 | 7.94 | | .01 |
| | Matched | 35.20% | 0.48 | 35.10% | 0.48 | 0.15 | −98.06% | .96 |
| Age at release | Total | 36.10 | 10.48 | 33.05 | 11.06 | 23.33 | | .00 |
| (years) | Matched | 34.88 | 10.23 | 34.94 | 11.80 | 0.52 | −97.79% | .90 |
| Metro | Total | 51.44% | 0.50 | 44.62% | 0.50 | 11.16 | | .00 |
| | Matched | 47.94% | 0.50 | 48.53% | 0.50 | 0.84 | −92.48% | .79 |
| Prior sex crimes | Total | 39.38% | 0.49 | 18.71% | 0.39 | 36.84 | | .00 |
| | Matched | 27.55% | 0.45 | 28.14% | 0.45 | 1.01 | −97.27% | .77 |
| Prior felony | Total | 54.39% | 0.50 | 63.62% | 0.48 | 15.29 | | .00 |
| | Matched | 58.33% | 0.49 | 56.96% | 0.50 | 1.88 | −87.72% | .53 |
| Stranger | Total | 11.72% | 0.32 | 9.33% | 0.29 | 6.27 | | .03 |
| | Matched | 10.69% | 0.31 | 9.90% | 0.30 | 2.09 | −66.67% | .56 |
| Acquaintance | Total | 53.65% | 0.50 | 60.16% | 0.49 | 10.72 | | .00 |
| | Matched | 57.25% | 0.49 | 56.67% | 0.50 | 0.81 | −92.47% | .79 |
| Adult female | Total | 20.29% | 0.40 | 19.06% | 0.39 | 2.53 | | .38 |
| | Matched | 21.47% | 0.41 | 20.20% | 0.40 | 2.47 | −2.38% | .48 |
| Male child | Total | 7.37% | 0.26 | 5.76% | 0.23 | 5.21 | | .06 |
| | Matched | 6.67% | 0.25 | 7.16% | 0.26 | 1.54 | −70.43% | .66 |
| Length of stay | Total | 36.63 | 24.50 | 23.31 | 21.25 | 46.33 | | .00 |
| (months) | Matched | 29.90 | 20.68 | 29.42 | 24.44 | 1.92 | −95.86% | .64 |
| Discipline | Total | 0.99 | 1.94 | 1.46 | 2.92 | 16.61 | | .00 |
| | Matched | 1.10 | 2.02 | 1.09 | 1.89 | 0.34 | −97.96% | .94 |
| Supervision | Total | 44.60 | 31.19 | 33.61 | 30.07 | 29.11 | | .00 |
| (months) | Matched | 39.14 | 28.84 | 37.88 | 31.86 | 3.94 | −86.45% | .35 |
| Intensive supervised | Total | 33.29% | 0.47 | 17.79% | 0.38 | 28.52 | | .00 |
| release | Matched | 24.71% | 0.43 | 23.33% | 0.42 | 2.51 | −91.20% | .47 |
| Supervised release | Total | 65.91% | 0.47 | 80.14% | 0.40 | 25.79 | | .00 |
| | Matched | 74.31% | 0.44 | 75.59% | 0.43 | 1.70 | −93.39% | .51 |
| Supervised release | Total | 0.93 | 0.27 | 0.73 | 0.13 | 12.63 | | .00 |
| revocations | Matched | 0.85 | 0.21 | 0.83 | 0.17 | 1.60 | −87.37% | .69 |
| Community | Total | 7.64% | 3.10 | 1.67% | 4.14 | 21.26 | | .00 |
| notification | Matched | 4.41% | 3.20 | 2.84% | 4.12 | 7.33 | −65.51% | .58 |
| Release year | Total | 1997.86 | 1.44 | 1996.88 | 1.41 | 23.09 | | .00 |
| | Matched | 1997.34 | 1.44 | 1997.07 | 1.46 | 0.86 | −96.27% | .09 |
| Risk score | Total | 3.77 | 1.88 | 3.93 | 1.83 | 7.17 | | .01 |
| | Matched | 3.80 | 1.89 | 3.84 | 1.86 | 1.83 | −74.47% | .61 |

Note: Total treated, $N = 1,493$; total untreated, $N = 1,737$; matched treated, $N = 1,020$; matched untreated, $N = 1,020$.

obtain matches for all the treated offenders. However, using a relatively narrow caliper of .10, we were still able to achieve 1,020 matches, which amounts to 68% of the total number of treated offenders ($N = 1,493$).

**Figure 1**
**Distribution of Propensity Scores by Treatment Assignment**



As shown in Table 3, the matching procedure reduced the bias in the propensity score (i.e., probability of entering treatment) by 98%. Again, we present the means for risk score even though it was not used as a predictor in the logistic regression model. In the unmatched sample, more than half of the covariates (9) had bias values greater than 20, and all but three were significantly different at the .05 level. In the matched sample, however, the covariates are balanced to the extent that all bias values are less than 20, and there are no statistically significant differences in covariates between the treated and untreated offenders. The average reduction in bias for the 18 covariates (including risk score) was 81%.

## Measures

*Dependent variable.* Recidivism, the outcome variable, was measured nine different ways in this study. It was first operationalized as (1) rearrest, (2) reconviction, or (3) reincarceration in a MCF for a new offense following an offender's first release from prison. Because it is important to know whether offenders recidivate with a sex offense, recidivism was further distinguished by the type of reoffense: (1) sex

offense, (2) violent offense (including sex offenses), and (3) any offense. Sex offense was defined here as a first- to fifth-degree criminal sexual conduct (CSC) offense. According to Minnesota statutes, CSC first to fourth degree are felony-level offenses, and CSC fifth-degree is a gross misdemeanor offense. In addition to sex crimes, violent offenses included homicide, assault, robbery, and kidnapping.

Arrest, conviction, and incarceration data were collected on offenders through December 31, 2006. The minimum follow-up period, then, was 3 years, whereas the maximum was 17 years. Data on arrests (misdemeanor, gross misdemeanor, and felony) and convictions (misdemeanor, gross misdemeanor, and felony) were obtained electronically from the Minnesota Bureau of Criminal Apprehension, whereas incarceration data were derived from the MNDOC's Correctional Operation Management System (COMS) database. Consequently, a limitation with these data is that they measure only arrests, convictions, or incarcerations that took place in the state of Minnesota. Moreover, as with any recidivism study, official criminal history data will likely underestimate the actual extent to which the sex offenders examined here recidivated.

An arrest, conviction, and/or incarceration was considered a recidivism event only if it pertained to an offense that had taken place following release. There were a handful of offenders who returned to prison for a "new" sex offense that had been committed prior to the beginning of their previous prison term, for example, an offender who was incarcerated from 1997 to 2000 (the beginning of the at-risk period) returns to prison in 2002 for an offense committed in 1995. In these instances, the offenses were not considered recidivism events, but the time that offenders served in prison was deducted from their at-risk period.

*Treatment variables.* In the statistical analyses presented later, recidivism is the dependent variable. Given that the central purpose of this study is to determine whether sex offender treatment has an impact on recidivism, treatment is the principal variable of interest. In an effort to acquire a more refined understanding of its potential effect on recidivism, we used two separate treatment measures.

The first treatment variable compared offenders who entered sex offender treatment with a comparison group of similar offenders who did not. As such, treatment was measured as "1" for treatment participants and as "0" for nonparticipants. The second treatment variable measured the impact of treatment outcome on reoffending. To this end, we created three dichotomous dummy variables: completion/ successfully participated until the time of release (1 = *completion/successful participation*; 0 = *treatment dropout or nonparticipants*), terminated from treatment or voluntarily quit (1 = *treatment terminations/quits*; 0 = *other*), and nonparticipants (1 = *comparison group*; 0 = *treatment participants*).

*Control variables.* The control, or independent, variables included in the statistical models were those that were not only available in the COMS database but also

Case 3:15-cr-00093   Document 98-1   Filed 04/04/18   Page 14 of 29 PageID #: 388

might theoretically have an impact on whether an offender recidivates. Prior research indicates that sex offender recidivism is predicted by factors such as prior sexual criminal history, victim characteristics, the intensity and length of postrelease supervision, and broad community notification (Duwe & Donnay, 2008; Hanson & Morton-Bourgon, 2004; Minnesota Department of Corrections, 2007). To control for potential rival causal factors, it was necessary to include variables such as these in the statistical analyses. The following lists these variables, which include pretreatment and posttreatment measures, and describes how they were created. The univariate relationships between these variables and the three types of recidivism are presented in the appendix.

- *Offender race*: dichotomized as White (0) or minority (1).
- *Age at release*: the age of the offender in years at the time of release based on the date of birth and release date.
- *Prior felony convictions*: offenders who had at least one prior felony conviction (excluding the instant offense) were given a value of 1, whereas those without a prior felony conviction were assigned a value of 0.
- *Prior sex crime convictions*: offenders who had at least one prior sex crime conviction (excluding the instant offense) were given a value of 1, whereas those without a prior sex crime conviction were assigned a value of 0.
- *Victim–offender relationship*: three dichotomous dummy variables were created to measure the offender's relationship to the victim for the instant sex offense, that is, the crime for which the offender was incarcerated. The three variables were stranger victims (1 = *stranger victim*; 0 = *known or nonstranger victim*), acquaintance victims (1 = *acquaintance victim*; 0 = *nonacquaintance victim*), and family member victims (1 = *family member victim*; 0 = *non–family member victim*). The family member victim variable, which is a proxy for incest offenders, serves as the reference in the statistical analyses.
- *Male child victims*: dichotomized as either male child victims (1) or nonmale child victims (0), this variable measures whether offenders victimized a male less than the age of 13 in their instant offense.
- *Adult female victims*: dichotomized as either adult female victims (1) or nonadult female victims (0), this variable quantifies whether offenders victimized women more than the age of 17 in their instant offense. Accordingly, this variable is a proxy for adult rapists.
- *Metro area*: a rough proxy of urban and rural Minnesota, this variable measures an offender's county of commitment, dichotomizing it into either metro area (1) or Greater Minnesota (0). The seven metro area (i.e., Minneapolis, St. Paul, and surrounding suburbs) counties are Anoka, Carver, Dakota, Hennepin, Ramsey, Scott, and Washington. The remaining 80 counties were coded as non–metro area or Greater Minnesota counties.
- *Recent disciplinary history*: this variable measures the number of formal disciplinary convictions that an offender received in the final 12 months prior to his initial release from prison. Because sex offenders often serve relatively long sentences, disciplinary convictions at the end of their term of imprisonment may be a more

valid predictor of postrelease behavior than the total number of convictions throughout the full prison term.

- *Risk score*: because formal risk assessment data were not available for the full 14-year period over which offenders were released, we followed the approach developed by Hanson, Broom, and Stephenson (2004) and created a recidivism risk score using the data available from the 10 preceding control variables. Offenders received a value of "1" if they were less than the age of 30 at the time of release, had at least one institutional discipline conviction in the 12 months prior to release, or had a value of "1" for the remaining eight controls (minority race, prior felony conviction, prior sex crime conviction, stranger victims, acquaintance victims, male child victims, adult female victims, and metro area). Thus, the maximum total score was 10, whereas the minimum score was 0.
- *Length of stay (LOS)*: the number of months between prison admission and release dates.
- *Length of postrelease supervision*: the number of months between an offender's first release date and the end of postrelease supervision, that is, the sentence expiration or conditional release date, the greater of the two.
- *Type of postrelease supervision*: three dichotomous dummy variables were created to measure the level of postrelease supervision to which offenders were released. The three variables were intensive supervised release (ISR; 1 = *ISR*; 0 = *non-ISR*), supervised release (SR; 1 = *SR*; 0 = *non-SR*), and discharge (1 = *discharge or no supervision*; 0 = *released to supervision*). Discharge is the variable that serves as the reference in the statistical analyses.
- *Supervised release revocations*: the number of times during an offender's sex crime sentence when he returned to prison as a supervised release violator for a technical violation.
- *Broad community notification*: dichotomized as either (1) broad community notification or (0) no broad community notification, this variable measures whether offenders were given a Level III risk level assignment prior to their release from prison and, thus, were subjected to broad community notification.
- *Release year*: measuring the year in which offenders were first released from prison for the instant sex offense, this variable is included to control for any unobserved differences between the 14 different release year cohorts from 1990 to 2003.

## Analysis

In analyzing recidivism, survival analysis models are preferable in that they use time-dependent data, which are important in determining not only whether offenders recidivate but also when they recidivate. As a result, the statistical technique we used was a Cox regression model, which uses both "status" and "time" variables in estimating the impact of the independent variables on recidivism. For the analyses presented here, the "status" variable was one of the recidivism variables mentioned above, for example, sex crime rearrest, violent crime rearrest. The "time" variable, on the other hand, measured the amount of time (in days) from the date of release until the date of first rearrest, reconviction, reincarceration, or December 31, 2006, for those who did not recidivate.

To accurately measure the total amount of time an offender was actually at risk to reoffend (i.e., "street time"), it was necessary to account for instances in which an offender was not at risk to recidivate following release from prison. Failure to do so would bias the findings by artificially increasing the lengths of offenders' at-risk periods. Accordingly, the time offenders spent in prison as supervised release violators was subtracted from their total at-risk period as long as it (1) preceded a reincarceration for a new offense or (2) occurred prior to January 1, 2007 (the end of the follow-up period) for those who did not recidivate. In addition, when recidivism was defined as a sex reoffense, time spent in prison was deducted for offenders reincarcerated for either a violent or a nonsex reoffense.

Because civilly committed offenders are incapacitated in a mental health institution, it was necessary to account for those who were civilly committed between September 1991—when Minnesota courts reenacted the civil commitment statute on released sex offenders—and December 31, 2006. Of the 3,533 sex offenders released from Minnesota prisons between 1990 and 2003, 93 were excluded because they were later civilly committed without ever spending any time in the community. Of these, 70 entered prison-based treatment, with 32 dropping out and the remaining 38 completing or participating until release. As expected, these offenders had a higher average risk score (4.82) than the other 3,440 offenders (3.89), which suggests that they had a greater recidivism risk than the sex offender population in general.

We included in the study 54 offenders who had spent time in the community but had later been civilly committed following a return to prison for either a supervised release violation or a new crime. Offenders who returned to prison for a supervised release revocation were "right censored" at the time of their civil commitment, that is, their at-risk period ended when they were civilly committed. For offenders who were civilly committed following a reincarceration for a new offense, they were right censored at the time of their commitment if the offense type was different from the type of recidivism being measured (e.g., sexual or violent). For example, when recidivism was measured as a violent reoffense, offenders were right censored at the time of their civil commitment following a return to prison for either a new sex or a nonsex crime.

We estimated Cox regression models for each of the nine recidivism measures for both treatment variables (participation and outcome). However, given that the reconviction and reincarceration results were substantively similar to those for rearrest for all three reoffense types, we present only the findings for rearrest because it is the most sensitive recidivism measure. Nevertheless, the reconviction and reincarceration results can be obtained from the authors on request. In addition, to determine whether there are certain types of offenders for whom treatment may be more effective, we estimated interaction models for each measure of recidivism. Similar to stepwise regression, we examined all first-order interactions with treatment and removed nonsignificant terms until only the significant interactions (at the .05 level) remained in the model.

# Results

As shown in Table 4, which breaks out recidivism rates by treatment participation and outcome, treated offenders had lower reoffense rates than untreated offenders for each of the three types of recidivism—sexual, violent, and general. Not surprisingly, the best recidivism outcomes were found for offenders who completed treatment or successfully participated until their release. These results suggest that the risk of recidivism may be significantly lowered by participating in prison-based treatment, especially for those who complete treatment or successfully participate until release. It is possible, however, that the observed recidivism differences between treated and untreated offenders as well as between treatment completers and dropouts are due to other factors such as prior criminal history, discipline history, or postrelease supervision. To statistically control for the impact of these other factors on reoffending, we estimated Cox regression models for each measure of recidivism across both treatment variables (participation and outcome).

## The Impact of Treatment on Sex Offender Recidivism

For each measure of recidivism, we initially ran two separate Cox regression models to estimate the effects of prison-based treatment. The first model, risk score, contained the 10-factor risk score measure along with the institutional and postrelease controls. The individual predictor model, on the other hand, was similar to the risk score model except that it showed the unique effects of the 10 predictors used to calculate the risk score. Because the results from the individual predictor models were similar to those from the risk score models for all three types of recidivism, only the findings from the risk score models are presented here. Results from the individual predictor models can be obtained, however, from the authors on request.

*Sexual recidivism.* The results shown in Table 5 indicate that, controlling for other factors, prison-based treatment significantly reduced the hazard ratio for a new sex offense rearrest, decreasing it by 27%. That is, sex offenders who participated in treatment recidivated less often and more slowly than untreated offenders; as a result, treated sex offenders survived longer in the community without committing a new sex offense (see Figure 2). In the individual predictor model, the hazard ratio was 28% lower for treatment participants.

Although not shown in Table 5, we also estimated Cox regression models that analyzed the impact of treatment outcome on sexual recidivism. Compared with the untreated offenders, the effect of dropping out of treatment—either quitting or being terminated—was in the negative direction and did not have a significant effect on sexual recidivism. Completing treatment, however, did significantly decrease the risk (hazard) relative to not receiving treatment, reducing it by 33% in the risk score model and 34% in the individual predictor model.

**Table 4**
**Three-Year and Total Recidivism Rates**
**by Treatment Participation and Outcome**

| Recidivism | Treatment Completers | Treatment Dropouts | Treatment Participants | Treatment Nonparticipants |
|---|---|---|---|---|
| Sexual rearrest | | | | |
| Three years | 7.1% (51) | 10.6% (32) | 8.1% (83) | 11.6% (118) |
| Total | 13.4% (96) | 16.2% (49) | 14.2% (145) | 19.5% (199) |
| Violent rearrest | | | | |
| Three years | 13.4% (96) | 16.9% (51) | 14.4% (147) | 19.3% (197) |
| Total | 29.0% (208) | 35.1% (106) | 30.8% (314) | 34.1% (348) |
| General rearrest | | | | |
| Three years | 29.1% (209) | 33.1% (100) | 30.3% (309) | 38.5% (393) |
| Total | 55.4% (398) | 59.3% (179) | 56.6% (577) | 58.1% (593) |
| N | 718 | 302 | 1,020 | 1,020 |

**Table 5**
**Cox Regression Model: Time to First Sex Offense Rearrest**

| Variables | Coefficient | SE | Hazard Ratio |
|---|---|---|---|
| Prison-based treatment | −0.317 | 0.110 | 0.729** |
| Risk score | 0.135 | 0.030 | 1.145** |
| Length of stay (months) | −0.010 | 3.0E-3 | 0.990** |
| Supervision length (months) | −3.1E-4 | 2.3E-3 | 1.000 |
| Intensive supervised release | −1.041 | 0.358 | 0.353** |
| Supervised release | −1.484 | 0.327 | 0.227** |
| Supervised release revocations | −0.066 | 0.049 | 0.936 |
| Community notification | −1.242 | 0.589 | 0.289* |
| Release year | −0.093 | 0.021 | 0.911** |
| N | 2,040 | | |

$*p < .05. **p < .01.$

We tested for interactions between the controls and the two treatment variables (participation and outcome) in both the risk score and individual predictor models, but none were statistically significant. The results from all four models, however, showed that longer lengths of stay in prison, postrelease supervision (ISR or supervised release), broad community notification, and release year were associated with a reduced risk of rearrest. The findings from both risk score models (treatment participation and outcome) revealed that risk score was a significant predictor of sexual recidivism; in the treatment participation model, a one unit increase in risk score increased the hazard ratio for sexual recidivism by 15%. In the two individual predictor models, minority offenders, younger offenders, and prior sex crime convictions were significantly associated with an increased risk of sexual recidivism.



**Figure 2**
**Survival Curves for Sexual Rearrest**



*Violent recidivism.* The results in Table 6 show that treatment had a statistically significant impact on violent offense recidivism. The hazard ratio for a violent rearrest was 18% lower for treated sex offenders in the risk score model and 19% lower in the individual predictor model (also see Figure 3). Compared with the untreated offenders, completing treatment reduced the risk (hazard) by 23% in the risk score model and by 24% in individual predictor model, whereas the effect of dropping out of treatment was in the negative direction and was not significant in either model. Similar to the sexual recidivism results, we did not find any statistically significant interactions between any of the controls and either treatment variable.

The findings from all four models (treatment participation/risk score, treatment participation/individual predictor, treatment outcome/risk score, and treatment outcome/ individual predictor) suggested that longer postrelease supervision periods, postrelease supervision (ISR and supervised release), and release year were significantly associated with a reduced risk of rearrest for a violent offense. Supervised release

**Table 6**
**Cox Regression Model: Time to First Violent Offense Rearrest**

| Variables | Coefficient | SE | Hazard Ratio |
|---|---|---|---|
| Prison-based treatment | −0.194 | 0.079 | 0.824* |
| Risk score | 0.157 | 0.022 | 1.170** |
| Length of stay (months) | −3.5E-3 | 2.0E-3 | 0.996 |
| Supervision length (months) | −4.1E-3 | 1.7E-3 | 0.996* |
| Intensive supervised release | −1.379 | 0.301 | 0.252** |
| Supervised release | −1.426 | 0.284 | 0.240** |
| Supervised release revocations | 0.169 | 0.029 | 1.184** |
| Community notification | −0.531 | 0.282 | 0.588 |
| Release year | −0.039 | 0.015 | 0.962** |
| N | 2,040 | | |

*$p < .05$. **$p < .01$.

**Table 7**
**Cox Regression Model: Time to First Rearrest for Any Offense**

| Variables | Coefficient | SE | Hazard Ratio |
|---|---|---|---|
| Prison-based treatment | −0.123 | 0.059 | 0.884* |
| Risk score | 0.198 | 0.016 | 1.219** |
| Length of stay (months) | −5.2E-3 | 1.5E-3 | 0.995** |
| Supervision length (months) | −3.9E-3 | 1.3E-3 | 0.996** |
| Intensive supervised release | −0.675 | 0.291 | 0.501* |
| Supervised release | −0.536 | 0.281 | 0.585 |
| Supervised release revocations | 0.083 | 0.026 | 1.089* |
| Community notification | −0.870 | 0.213 | 0.419** |
| Release year | 0.026 | 0.011 | 1.027* |
| N | 2,040 | | |

*$p < .05$. **$p < .01$.

revocations, on the other hand, significantly increased the risk in all four models. Risk score was a significant predictor of violent recidivism in both treatment variable models, whereas minority offenders, younger offenders, and prior felony convictions significantly increased the hazard ratio for rearrest in the individual predictor models.

*General recidivism.* As shown in Table 7, participating in treatment had a statistically significant effect on general recidivism, reducing the hazard ratio for rearrest for any offense by 12% (also see Figure 4). In the individual predictor model, the hazard ratio was 14% lower for treated offenders. The treatment outcome results suggest that, compared with untreated offenders, completing treatment

**Figure 3**
**Survival Curves for Violent Rearrest**



significantly decreased the risk (hazard) for any offense by 15% in the risk score model and by 17% in the individual predictor model. The effect of dropping out of treatment, relative to not participating in treatment, was in the negative direction and was not statistically significant in both models. Once again, we did not find any statistically significant interactions between the controls and either treatment variable.

Longer periods of postrelease supervision, longer lengths of stay in prison, ISR, and broad community notification significantly decreased the hazard ratio for rearrest in all four models, whereas release year and supervised release revocations were significantly and positively associated with recidivism risk. Risk score significantly increased the risk of rearrest in both treatment models. In the individual predictor models, minority offenders, younger offenders, prior felony convictions, a history of victimizing acquaintances, and recent institutional disciplinary convictions

**Figure 4**
**Survival Curves for General Rearrest**



significantly increased the risk of general recidivism. In contrast, prior sex crime convictions and a history of victimizing male children significantly decreased the risk.

## Sensitivity Analyses

*Intent to treat.* The results presented above suggest that prison-based treatment in Minnesota significantly reduces sexual, violent, and general recidivism. But in using PSM to identify the untreated offenders most likely to refuse treatment, it is possible that we may have underestimated the number of offenders who would have refused to enter treatment had it been offered to them. For example, treatment refusers (105) accounted for 6.6% of the offenders (1,598) who were offered treatment. Yet the 105 offenders matched to the treatment refusers made up 5.7% of those not offered treatment (1,842). If the rate of refusal was the same among the 1,842 not offered

treatment, then 121 offenders (6.6% of 1,842) would have refused a treatment offer. The results from the preceding analyses could be biased, then, to the extent that 16 additional offenders needed to be removed from the comparison group pool but were not.

To address potential treatment refuser bias, we conducted intent-to-treat (ITT) analyses based on whether offenders were offered treatment. ITT analysis does not measure the effectiveness of treatment administered insofar as treatment refusers are considered to be "treated" offenders. It can be used, however, to test whether our results are robust to possible treatment refuser bias.

We began the ITT analyses by using PSM to individually match offenders not offered treatment with those who received a treatment offer. We estimated a logistic regression model in which the dependent variable was a treatment offer (i.e., the 1,598 offenders offered treatment were assigned a value of "1," whereas the 1,842 untreated offenders not offered treatment received a value of "0"). The predictors were the 17 control variables (excluding risk score) described earlier. After obtaining propensity scores on the 3,440 offenders, we used the greedy matching procedure to individually match offenders from both groups. Using a caliper of .10, we were able to obtain a sample of 2,224 in which all of the covariates were balanced. The number of matches (1,112) accounted for 70% of the total number of offenders offered treatment ($N = 1,598$). Moreover, of the 1,112 matched pairs, 85 were treatment refusers (81% of the 105 refusers).

Using Cox regression, we estimated risk score models for sexual, violent, and general recidivism. The results from these models, which can be obtained from the authors, showed that the hazard ratios for offenders offered treatment were significantly lower for all three types of recidivism. In particular, the hazard ratios were 19% lower for sexual recidivism ($B = -.209$; $SE = .101$), 14% lower for violent recidivism ($B = -.156$; $SE = .073$), and 16% lower for general recidivism ($B = -.175$; $SE = .056$). Compared with the recidivism analyses reported in the previous section, the hazard ratios were smaller for sexual and violent recidivism but were slightly larger for general recidivism.

*Rosenbaum bounds.* As indicated by the results from the ITT analyses, the treatment effects were robust against possible treatment refuser bias. Yet, given that PSM controls only for bias among the observed covariates, the possibility exists that unobserved selection bias may account for the significant treatment effects. Hidden bias can occur when two offenders with the same observed covariates have different chances of receiving treatment due to an unobserved covariate. If this unobserved covariate is related to the outcome (recidivism) affected by treatment, then the failure to account for this hidden bias can alter conclusions drawn about the effects of treatment.

We tested the sensitivity of our results to hidden bias by using a method developed by Rosenbaum (2002) that calculates a bound on how large an effect an unobserved covariate would need to have on the treatment selection process to reverse

inferences drawn about the effects of treatment. The Rosenbaum bounds sensitivity analysis produces a test statistic, gamma, that measures the threshold at which an unobserved covariate would cause the estimated treatment effect to no longer be statistically significant (i.e., $p > .05$). More specifically, the closer the gamma value is to 1, the stronger the possibility that the effect can be explained away by an unobserved covariate. Therefore, an estimated treatment effect with a gamma value of, say, 1.5 would be more sensitive to hidden bias than an effect with a gamma value of 2.0.

It is important to emphasize, however, that the Rosenbaum bounds method is limited in two important ways. First, the sensitivity analysis does not indicate whether unobserved bias exists. Rather, it simply identifies how large the hidden bias would need to be to nullify the estimated treatment effect. Second, as DiPrete and Gangl (2004) point out, the Rosenbaum bounds method is a "worst-case" scenario to the extent that it assumes the hypothetical unobserved covariate is an almost perfect predictor of the outcome variable (recidivism).

The results from the sensitivity analyses reveal that the estimated treatment effects are not especially robust to hidden bias. With a gamma value of 1.02, the general recidivism findings are the most sensitive to the possibility of hidden bias, followed by violent recidivism (gamma = 1.09) and sexual recidivism (gamma = 1.15). These results suggest that if an unobserved covariate that almost perfectly predicted general recidivism differed between matched pairs of treated and untreated offenders by a factor of 1.02 or more, it would be sufficient to undermine the conclusions regarding the treatment effect. To put this statistic in perspective, LOS would be a hidden bias equivalent in that, as shown earlier in Table 2, it had a comparable impact on the treatment selection process ($b = .02$). Therefore, if an unobserved covariate existed that perfectly predicted general recidivism and had an impact on the treatment selection process similar to LOS, it would be sufficient to invalidate the treatment effect for general recidivism. Furthermore, most of the significant predictors of treatment selection shown earlier in Table 2 had effect sizes ($b > .15$) that exceeded the gamma value for sexual recidivism (1.15), which was the least sensitive to possible hidden bias. Still, it is worth reiterating, however, that the Rosenbaum bounds method is a "worst-case" scenario. Although existing research has identified a number of factors that are significantly associated with sex offender recidivism, none have yet to be shown to be a nearly perfect predictor of reoffending, which is what the Rosenbaum bounds approach assumes.

## Conclusion

The results from this study suggest that prison-based treatment in Minnesota produces a significant, albeit relatively modest, reduction in sex offender recidivism. Indeed, entering treatment lowered the risk of rearrest for a new offense by 12% for

Case 3:15-cr-00093   Document 98-1   Filed 04/04/18   Page 25 of 29 PageID #: 399

general recidivism, 18% for violent recidivism, and 27% for sexual recidivism. The average sexual recidivism rate was 27% lower for treated offenders (14.2%) than for untreated offenders (19.5%), which is similar to the reduction reported by Hanson et al. (2002) but lower than that (37%) reported by Lösel and Schmucker (2005) in their meta-analyses of the treatment evaluation literature. Moreover, the effect size for sexual recidivism ($d = .21$), which translates into an odds ratio of 1.46 (Lösel & Schmucker, 2005; Sánchez-Meca, Marín-Martínez, & Chacón-Moscoso, 2003), falls within the lower end of the range ($d = .12-.47$) observed in previous meta-analytic reviews.

Dropping out of treatment did not significantly increase the risk of recidivism, although completing treatment lowered it for sexual rearrest by 33%, violent rearrest by 23%, and any arrest by 15%. In addition, we did not find treatment to be significantly more, or less, effective for certain types of sex offenders. The absence of any significant interactions is important in its own right, however, for it suggests that treatment is similarly effective not only for adult rapists and child molesters but also for incest offenders and those who victimize acquaintances or strangers.

Although the findings reported here support the notion that prison-based sex offender treatment is moderately effective in Minnesota, there are several limitations worth reiterating. First, due to a lack of data, this study did not account for the potential impact that community-based treatment may have had on recidivism. Prior research has shown that community-based treatment significantly lowers the extent to which sex offenders recidivate, particularly with regard to sex offenses (Aytes, Olsen, Zakrajsek, Murray, & Ireson, 2001; Marshall & Barbaree, 1988; Marshall, Eccles, & Barbaree, 1991; McGrath, Hoke, & Vojtisek, 1998). It is possible, then, that the sexual recidivism differences between treated and untreated offenders may reflect variations in the extent to which each group participated in community-based treatment, that is, more prison-treated offenders may have participated in community-based treatment than untreated offenders.

Recall, however, that sex offenders who do not receive treatment while incarcerated are directed, as part of their postrelease supervision conditions, to enter treatment while in the community. As a result, it is unlikely that prison-treated offenders were significantly more likely to participate in community-based treatment than offenders who were not treated in prison. If anything, sex offenders who were untreated in prison likely had a higher rate of participation in community-based treatment than prison-treated offenders. Accordingly, if community-based treatment is as effective in Minnesota as suggested by prior research, it may have moderated the observed effect for prison-based treatment. Therefore, the actual effect of prison-based treatment may be stronger than what was reported in this study.

Second, because this study did not use a randomized experimental design, some may argue that it does not provide an adequate assessment of the effectiveness of prison-based treatment—in Minnesota or in general. However, random assignment does not guarantee equivalence between treated and untreated offenders (Marques

et al., 2005). Moreover, as Hanson, Broom, and Stephenson (2004) point out, no single study—regardless of how rigorous the design—is sufficient to determine whether treatment works. Instead, Hanson and colleagues argue that advances in the understanding of sex offender treatment will be made when individual studies improve and the cumulative results from these studies are meaningfully integrated through meta-analyses. This study thus contributes to the advancement of the sex offender treatment literature by not only examining a relatively large number of sex offenders but also by using multiple treatment and outcome measures, a lengthy follow-up period, a matching technique that controlled for observable selection bias, and sensitivity analyses that addressed treatment refuser and hidden selection bias.

## Appendix
### Univariate Relationships Between Control Variables and Recidivism

| Control Variables<br>Dichotomous Variables | Sexual Rearrest<br>Odds Ratios | Violent Rearrest<br>Odds Ratios | Any Rearrest<br>Odds Ratios |
|---|---|---|---|
| Minority | 1.002 | 1.658** | 1.804** |
| Metro | 1.314** | 1.359** | 1.346** |
| Prior sex crimes | 1.363** | 0.903 | 0.746** |
| Prior felony | 1.161 | 1.451** | 1.997** |
| Stranger | 1.369* | 1.498** | 1.246 |
| Acquaintance | 1.152 | 1.311** | 1.676** |
| Adult female | 1.092 | 1.387** | 1.427** |
| Male child | 1.272 | 0.762 | 0.608** |
| Intensive supervised release | 0.788* | 0.660** | 0.640** |
| Supervised release | 1.082 | 1.331** | 1.508** |
| Community notification | 0.608* | 0.632* | 0.476** |
| Ordinal/Interval Variables | AUC | AUC | AUC |
| Age at release (years) | 0.360** | 0.404** | 0.455** |
| Length of stay (months) | 0.467* | 0.461** | 0.425** |
| Discipline | 0.543** | 0.583** | 0.595** |
| Supervision (months) | 0.443** | 0.415** | 0.438** |
| Supervised release revocations | 0.522 | 0.579** | 0.562** |
| Release year | 0.377** | 0.371** | 0.400** |
| Risk score | 0.564** | 0.622** | 0.649** |
| $N$ | 3,440 | 3,440 | 3,440 |

Note: AUC = area under the curve.
*$p < .05$. **$p < .01$

## References

Alexander, M. A. (1999). Sexual offender treatment efficacy revisited. *Sexual Abuse: A Journal of Research and Treatment, 11*, 101-116.

Aytes, K. E., Olsen, S. S., Zakrajsek, T., Murray, P., & Ireson, R. (2001). Cognitive/behavioral treatment for sexual offenders: An examination of recidivism. *Sexual Abuse: A Journal of Research and Treatment, 13*, 223-231.

Caldwell, M., Skeem, J., Salekin, R., & Van Rybroek, G. (2006). Treatment response of adolescent offenders with psychopathy features. *Criminal Justice and Behavior, 33*, 571-596.

DiPrete, T. A., & Gangl, M. (2004). Assessing bias in the estimation of causal effects: Rosenbaum bounds on matching estimators and instrumental variables estimation with imperfect instruments. *Sociological Methodology, 34*, 271-310.

Duwe, G., & Donnay, W. (2008). The impact of Megan's law on sex offender recidivism: The Minnesota experience. *Criminology, 46*, 411-446.

Furby, L., Weinrott, M.R., & Blackshaw, L. (1989). Sex offender recidivism: A review. *Psychological Bulletin, 105*, 3-30.

Gallagher, C. A., Wilson, D. B., Hirschfield, P., Coggeshall, M. B., & MacKenzie, D. L. (1999). A quantitative review of the effects of sex offender treatment on sexual reoffending. *Corrections Management Quarterly, 3*, 19-29.

Hall, G. C. N. (1995). Sexual offender recidivism revisited: A meta-analysis of recent treatment studies. *Journal of Consulting and Clinical Psychology, 63*, 802-809.

Hanson, R. K., Broom, I. R., & Stephenson, M. (2004). Evaluating community sex offender treatment programs: A 12-year follow-up of 724 offenders. *Canadian Journal of Behavioural Science, 37*, 87-96.

Hanson, R. K., Gordon, A., Harris, A. J. R., Marques, J. K., Murphy, W. D., & Quinsey, V.L. (2002). First report on the collaborative outcome data project on the effectiveness of psychological treatment for sex offenders. *Sexual Abuse: A Journal of Research and Treatment, 14*, 169-194.

Hanson, R. K., & Morton-Bourgon, K. (2004). Predictors of Sexual Recidivism: An updated meta-analysis (User Rep. No. 2004-02). Ottawa, Ontario, Canada: Department of the Solicitor General of Canada.

Harkins, L., & Beech, A. (2006). Measurement of the effectiveness of sex offender treatment. *Aggression and Violent Behavior, 12*, 36-44.

Jones, N., Pelissier, B., & Klein-Saffran, J. (2006). Predicting sex offender treatment entry among individuals convicted of sexual offense crimes. *Sexual Abuse: A Journal of Research and Treatment, 18*, 83-98.

Kenworthy, T., Adams, C. E., Brooks-Gordon, B., & Fenton, M. (2004). Psychological interventions for those who have sexually offended or are at risk of offending. *Cochrane Database of Systematic Reviews*, Issue 3: CD004858.

Lösel, F., & Schmucker, M. (2005). The effectiveness of treatment for sexual offenders: A comprehensive meta-analysis. *Journal of Experimental Criminology, 1*, 117-146.

Marques, J. K. (1999). How to answer the question, "Does sex offender treatment work?" *Journal of Interpersonal Violence, 14*, 437-451.

Marques, J. K., Day, D. M., Nelson, C., & West, M. A. (1994). Effects of cognitive-behavioral treatment on sex offender recidivism: Results of a longitudinal study. *Criminal Justice and Behavior, 21*, 28-54.

Marques, J. K., Wiederanders, M., Day, D. M., Nelson, C., & von Ommeren, A. (2005). Effects of a relapse prevention program on sexual recidivism: Final results from California's Sex Offender Treatment and Evaluation Project (SOTEP). *Sexual Abuse: A Journal of Research and Treatment, 17*, 79-107.

Marshall, W., & Barbaree, H. (1988). The long-term evaluation of a behavioral treatment program for child molesters. *Behavior Research and Therapy, 26*, 499-511.

Marshall, W., Eccles, A., & Barbaree, H. (1991). The treatment of exhibitionists: A focus on sexual deviance versus cognitive and relationship features. *Behavior Research and Therapy, 29*, 129-135.

McGrath, R. J., Hoke, S. E., & Vojtisek, J. E. (1998). Cognitive-behavioral treatment of sex offenders. *Criminal Justice and Behavior, 25*, 203-225.

Minnesota Department of Corrections. (2007). *Sex offender recidivism in Minnesota*. St. Paul, MN: Author.

Quinsey, V. L., Harris, G. T., Rice, M. E., & Lalumiere, M. L. (1993). Assessing treatment efficacy in outcome studies of sex offenders. *Journal of Interpersonal Violence, 8*, 512-523.

Rice, M. E., & Harris, G. T. (2003). The size and sign of treatment effects in sex offender therapy. *Annals of the New York Academy of Sciences, 989*, 428-440.

Rosenbaum, P. (2002). *Observational studies* (2nd ed.). New York: Springer.

Rosenbaum, P. R., & Rubin, D. B. (1984). Reducing bias in observational studies using subclassification on the propensity score. *Journal of the American Statistical Association, 79*, 516-524.

Rosenbaum, P. R., & Rubin, D. B. (1985). Constructing a control group using multivariate matched sampling methods that incorporate the propensity score. *The American Statistician, 39*, 33-38.

Rubin, D. B. (1997). Estimating causal effects from large data sets using propensity scores. *Annals of Internal Medicine, 127*, 757-763.

Sánchez-Meca, J., Marín-Martínez, F., & Chacón-Moscoso, S. (2003). Effect-size indices for dichotomized outcomes in meta-analysis. *Psychological Methods, 8*, 448-467.

Shadish, W. R., Cook, T. D., & Campbell, D. T. (2002). *Experimental and quasi-experimental designs for generalized causal inference*. Boston: Houghton Mifflin.

Skeem, J. L., Monahan, J., & Mulvey, E. P. (2002). Psychopathy, treatment involvement, and subsequent violence among civil psychiatric patients. *Law and Human Behavior, 26*, 577-603.