UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA          )
                                  )
v.                                )     NO.  3:15-cr-00093
                                  )     SENIOR JUDGE ASPEN
JARRATT TURNER                    )

JARRATT TURNER'S **REDACTED** SENTENCING MEMORANDUM

Jarratt Turner, through counsel, files the instant sentencing memorandum in support of

a sentence of 30 years.  Jarratt Turner submits that the advisory guidelines range is excessive

and far "greater than necessary" to satisfy the objectives of sentencing set forth in 18 U.S.C. §

3553(a).

I.      INTRODUCTION

Jarratt Turner stands before this Honorable Court as a man who has **XXX** severe drug

addiction, which drove him to attempt suicide multiple times. Jarratt Turner knows that he has

made horrible choices.  Not a day that goes by that he does not mentally torment himself over

the pain that his actions have caused others.

II.     ARGUMENT

This Honorable Court has the tremendous task of determining the most appropriate

sentence in this case. During his tenure as a Circuit Judge, current Supreme Court Justice Neil

Gorsuch discussed the job at hand:

> Sentencing someone to prison has to be one of the district judge's
> toughest tasks.  So much is at stake for the defendant, the victim,
> and the community.  So much responsibility rests on the judge's
> shoulders, along with the high expectations that the judge will

1

> wisely weigh things that cannot be easily weighed. How much
> punishment is enough to protect the public? To deter future
> wrongdoing? To reflect the gravity of the offense? And how
> much punishment suffices to accomplish all of these things
> without verging on cold revenge or needless retribution? There's
> rarely a single right answer to hard questions like these. So our
> system depends, as perhaps it must, on the discretion of
> thoughtful judges. One tool district judges have to help them in
> their unenviable task is the advisory sentencing guidelines. The
> guidelines seek to supply some sense of what other courts across
> the country are doing in similar cases and what sentencing experts
> think may be appropriate. [citations omitted]. Of course, each
> defendant must be assessed on his or her terms: courts are not
> machine presses and sentences are not widgets to be churned out
> on some criminal justice conveyor belt.

*United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014)

(emphasis added).

Under the landmark decision of *United States v. Booker*, the Sentencing Guidelines are no longer binding on the court. 543 U.S. 220 (2005). Instead, the court must look to the multiple factors outlined in 18 U.S.C. § 3553(a) and impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing – justice, deterrence, incapacitation, and rehabilitation. *United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006). In imposing a sentence, the court must consider *all* of the factors set forth in § 3553(a)(1)-(7). *Id.* (explaining that court should consider Guideline range as one factor in the mix of seven factors under § 3553(a)). While these seven factors include the applicable sentencing range and the Commission's policy statements, including departures, the other factors play an equal role under the statutory scheme. *See* 18 U.S.C. § 3553(a)(1)-(7); *United States v. McBride*, 434 F. 3d 470, 475-76 (explaining that guidelines are just one of the numerous factors that sentencing court must consider). These additional factors include the "nature and circumstances of the offense,"

2

the "history and characteristics of the offender," and the "kind of sentences available." *See* 18 U.S.C. § 3553(a)(1), (7).

In other words, in the wake of *Booker*, a sentencing court can grant either a departure (if the court finds that the express criteria for a particular departure, as set forth in the applicable departure guideline, have been satisfied) or a variance (a deviation from the advisory guidelines range based on the sentencing court's consideration of the § 3553(a) factors). In terms of variances from the advisory guidelines, "courts may vary [from an advisory range] based solely on policy considerations, including disagreements with the [g]uidelines." *Kimbrough v. United States*, 552 U.S. 85, 100-02 (2007) (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (district courts may find that the "[g]uidelines sentence itself fails properly to reflect § 3553(a) considerations"). For example, in *Kimbrough*, the Supreme Court found that the district court had the discretion to conclude that the crack/powder disparity in the drug guidelines was unwarranted and "yield[ed] a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 91, 109-10; *see also Spears v. United States*, 555 U.S. 261, 267 (2009) ("District courts are entitled to vary from the crack cocaine [g]uidelines even in a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the [g]uidelines' sentencing range.").

At bottom, the sentencing court "may not presume that the [g]uidelines range is reasonable," *Gall v. United States*, 552 U.S. 38, 50 (2007), and cannot "require 'extraordinary' circumstances to justify a sentence outside the guidelines range." *United States v. Bolds*, 511 F.3d 568, 580-81 (6th Cir. 2007). The district judge "must [instead] make an individualized assessment based on the facts presented and upon a thorough consideration of all of the §

3

3553(a) factors." *Id*. at 580 (quoting *Gall*, 552 U.S. at 50). Although the Sentencing Commission "fills an important institutional role" in promulgating the guidelines, the sentencing judge "has greater familiarity with the individual case and the individual defendant before him . . . [and] is therefore in a superior position to find facts and judge their import under § 3553(a) in each particular case." *Kimbrough*, 552 U.S. at 109 (internal quotations and citations omitted).

To be clear, the Sentencing Guidelines are merely advisory. They are so advisory that sentencing judges are not only free to disagree with how a guideline applies in a particular case, but they are also free to disagree with how a given guideline applies to cases in general. That is, the courts can categorically reject a guideline based on a policy disagreement with the guideline, especially when the Sentencing Commission has failed to base that guideline on independent empirical study. *Spears v. United States*, 129 S. Ct. 840 (2009); *United States v. Kamper*, 748 F.3d 728, 741-42 (6th Cir. 2014) ("We have recognized courts' authority in appropriate cases to reject the Guidelines sentencing ranges based on articulated policy disagreements in a range of contexts.").

In recent years, the guideline at issue here – § 2G2.1, which addresses the production of child pornography – has sometimes been rejected by courts categorically. *United States v. Almazan*, 908 F. Supp. 2d 963, 970 (N.D. Iowa 2012); *United States v. Price*, 2012 U.S. Dist. LEXIS 38397, *33-34 (C.D. Ill. March 21, 2012). They have done so for two reasons. First, they have done so because § 2G2.1 is "not the product of empirical study by the Sentencing Commission" but rather it is the product of political decrees from Congress. *Price*, 2012 U.S. Dist. LEXIS 38397 at *33-34. That is, it lacks a reasoned, expert, or empirical basis. Second,

4

§ 2G2.1's enhancements apply to such a large percentage of the offenders that the guideline winds up treating the vast majority of offenders as if they were all the worst of the worst. *Id*. That is, it fails to reasonably differentiate the many shades of gray amongst offenders, simply treating them all extremely harshly. *Id*. This Court, likewise, could reject § 2G2.1 categorically for these reasons.

Even when courts have stopped short of rejecting § 2G2.1 categorically, they have still shown increasing disagreement with it in particular cases. They have done so by increasingly declining its advice and by instead choosing a sentence below the advisory range. In fiscal year 2007, only 13% of defendants sentenced under § 2G2.1 received a sentence below the guideline range absent a government-sponsored motion (i.e., 22 out of 164 cases). (U.S. Sentencing Commission, Final Quarterly Data Report, at 14 (Fiscal Year 2007).) But in fiscal year 2016, that figure was more than double, at about 28%. (U.S. Sentencing Commission, Quarterly Data Report, at 16 (Sept. 2016) (117 out of 421 cases).)

Jarratt Turner asks this Court to reject the excessive and oppressive character of the Guidelines. He requests a sentence of 30 years. Both the government and the United States Probation Office rely on the Guidelines to request a sentence that equals death in prison. However, a death sentence is far greater than necessary to achieve the statutory goals of sentencing.

## III.    Sentencing Factors

### A.    The Nature of The Offense

There is no doubt that Turner's offense was horrific and reveals that he suffers from a serious problem. But "'not all . . . sex offenders deserve what amounts to a life sentence.'"

5

*United States v. Aleo*, 681 F.3d 290, 301 (6th Cir. 2012) (quoting *United States v. Poynter*, 495 F.3d 349, 354 (6th Cir. 2007)). Turner's offenses could have been worse in that they could have involved the forceful sexual abuse of a small child old enough to understand the abuse and be forever scarred by it. He says that not to minimize the egregiousness of his actual offenses, but only to point out that it could have been even worse. And Turner has expressed genuine remorse, wanting to find a way to cure his problem and make amends as much as possible.

### B.     Jarratt Turner's History and Characteristics

On the one hand, Jarratt Turner had many things going for him. He grew up in a two parent home where all of his needs were met. In fact, they were well off and lived in a large home in New Jersey. However, there was a darker side to his family. His father, who was a Vietnam Veteran, suffered from Post-Traumatic Stress Disorder and at times was abusive. On one occasion in particular, Jarratt Turner's father slammed him on the ground and tried to choke him.

**XXXXX**

While searching for a way to escape his confusion and insecurities, Jarratt Turner found drugs. In middle school, he began abusing drugs such as marijuana, cough syrup, and huffing paint. In some ways drugs allowed him to feel free. Jarratt states that "when I was high, I didn't have to face my insecurities XXXX. In particular, marijuana calmed his nerves and allowed him to deal with anxiety. Similarly, party drugs such as ecstasy allowed him to have fun without stressing XXXX. Unfortunately, Jarratt Turner also turned to crack cocaine. Crack seemed to be the main solution to his emotional stress. When on crack, Jarratt completely checked out. He didn't have to talk or interact with anyone. Unfortunately, crack's high is short-

lived, and so Jarratt Turner had to keep using to escape his reality. This heavier drug took a serious emotional toll on Jarratt. The crack caused him to suffer bouts of insomnia. Jarratt would abuse crack so much that he may go on a binge for weeks at a time. Jarratt believes that the crack episodes also led to his reoccurring suicidal ideations. Furthermore, the crack actually led to his alcohol abuse. Jarratt began drinking heavily so that he would pass out and sleep.

After years of using drugs to escape, Jarratt Turner decided to get clean. At age 19, he began attending NA meetings. Jarratt enjoyed the meetings. He appreciated the interaction with other people who were on the same path of recovery. (Exhibit 4, attached, Letter from Chuck Paetz). Through the program, Jarratt Turner worked with a sponsor and the two became close. In the name of recovery, Jarratt revealed to his sponsor the real reason he had turned to drugs. Jarratt hoped that this revelation would lead to greater understanding of his addiction.

XXXXX

Courts have long recognized that a defendant's difficult childhood is a mitigating factor at sentencing. *See, e.g., California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring) (explaining that "evidence about the defendant's background and character is relevant [in death penalty case] because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse"); *Santosky v. Kramer*, 455 U.S. 745, 789 (1982) (Rehnquist, J., joined by Burger, C.J., White, and O'Connor, J., dissenting) ("It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens"). When, for example, a defendant was exposed to domestic violence or illegal drug use as a child,

7

a sentencing court may find that he is less culpable for the choices he later made as a young adult. *See, e.g., United States v. Walter*, 256 F.3d 891, 894 (9th Cir. 2001) (finding that "[t]he combination of brutal beatings by his father, the introduction to drugs and alcohol by his mother, and . . . the sexual abuse he faced at the hands of his cousin" should have been considered by district court as possible grounds for departure); *United States v. Lopez*, 938 F.2d 1293, 1298 (D.C. Cir. 1991) (remanding to district court for consideration of exposure to domestic violence as possible grounds for departure). Similarly, when a defendant was the victim of physical or sexual abuse as a child, he may carry psychological scars into adulthood that make him less culpable for his criminal conduct. *United States v. Rivera*, 192 F.3d 81, 85 (2d Cir. 1999) (explaining that pre-*Booker* departure could be granted on "ground that extreme childhood abuse caused mental and emotional conditions that contributed to the defendant's commission of the offense"); *United States v. Roe*, 976 F.2d 1216, 1218 (9th Cir. 1992) (allowing pre-*Booker* departure based on "psychological effects of childhood abuse" ).

Although there is no excuse for Turner's crimes, XXXXX

Granting Turner some leniency in light of this abuse would be completely appropriate.

XXXXX Jarrett Turner hit rock bottom. Instantly, he abused some hard drugs. Within a week, Jarratt Turner attempted suicide. As he stood on the bridge crying, he pulled out a revolver and was prepared to end it all. Jarratt pulled the trigger….click….it didn't fire. Feeling both disappointed and relieved, Jarratt decided not to kill himself. At least, not that day.

Jarratt Turner suffers from Bi-polar Depression disorder. He was first diagnosed in high school, XXXX.

Although his mother did not know the real source of Jarratt's depression, she sent him to a therapist for a year. While the therapist helped Jarratt talk through some of his issues, XXX. During this time, Jarratt Turner began medication for his Bi-polar disorder. There were times when the medication really seemed to help Jarratt cope with his depression. However, he often self-medicated with other drugs to escape.

Exercising its substantial sentencing discretion, a sentencing court can vary or depart below the advisory range based on a defendant's mental health problems. *See, e.g., United States v. Mendez*, 284 F. App'x 653, 661 (11th Cir. 2008) (granting modest reduction in sentence on basis of defendant's "mental problems"). "Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks." *See* National Institute of Mental Health, Bipolar Disorder Overview (August, 2017), available at https://www.nimh.nih.gov/health/topics/bipolar-disorder/index.shtml.

> People with bipolar disorder experience periods of unusually intense emotion, changes in sleep patterns and activity levels, and unusual behaviors. These distinct periods are called "mood episodes." Mood episodes are drastically different from the moods and behaviors that are typical for the person. Extreme changes in energy, activity, and sleep go along with mood episodes.

*Id*.

XXX Turner's mental illness partly explains his offense and his inability to correct his behaviors without serious intervention. That illness likewise weighs in favor of granting some leniency.

9

### C.    Prison Death Sentence

Here, the government and the United States Probation Office are requesting a sentence of death in prison. Although the government uses terms like, a sentence for natural life, and the United States Probation Office is recommending 120 years to serve, they are both asking that this Court sentence Jarratt Turner to die in prison. While Jarratt Turner recognizes that his actions have caused suffering to the children and their families, a sentence of death is not warranted.

According to the U.S. Center for Disease Control and Prevention, a white male living in the United States has a life expectancy of 79 years. U.S. Center for Disease Control and Prevention, *National Vital Statistics Report*, Vol. 66, No. 4, Table 5 at p.17 (Aug. 2017).[1] However, in terms of a life sentence in prison, the analysis does not end there. The stress of prison has a significant impact on human life. "As a statistical matter, the life expectancy of an incarcerated person drops significantly for each year of incarceration." *United States v. Jenkins*, 854 F.3d 181, 186 (2d Cir. 2017) (citing Evelyn J. Patterson, *The Dose-Response of Time Served in Prison on Mortality:  New York State 1989-2003*, 103 Am. J. of Pub. Health 523, 526 (2013)).., The Bureau of Prisons treats a prisoner as if he or she is "10-15 years older than his or her chronological age" due in part to "stresses associated with incarceration."  U.S. DOJ, *Aging Inmate Population, supra* at 2; *see United States v. Jenkins*, 854 F.3d 181, 186 (2d Cir. 2017).

---

[1] Available at: https://www.cdc.gov/nchs/data/nvsr/nvsr66/nvsr66_04.pdf.  Courts "[t]ypically . . . take judicial notice of [a party's] life expectancy."  *Crane v. Crest Tankers*, 47 F.3d 292, 295 (8th Cir. 1995); *see, e.g., United States v. Jenkins*, 854 F.3d 181, 186 n.4 (2d Cir. 2017) (when reviewing a child-pornography sentence, calculating the defendant's life expectancy from the Center for Disease Control's life tables).

Case 3:15-cr-00093   Document 98-4   Filed 04/04/18   Page 10 of 18 PageID #: 566

Considering the above life statistics, Jarratt Turner, if lucky, may live between the ages of 65 and 70 years in prison. Therefore, a sentence of 30-35 years would likely be a death sentence, also called a life sentence without parole. "Life without parole sentences share some characteristics with death sentences that are shared by not other sentences." *Graham v. Florida*, 560 U.S. 48, 69 (2010).  A sentence that denies the convict any "realistic opportunity to obtain release before the end of [its] term" thereby deprives "the convict of the most basic liberties without giving hope of restoration," and it "means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of the convict, he will remain in prison for the rest of his days." *Id.* at 69-70, 82 (internal punctuation and citations omitted).

Such life sentences should be reserved for murderers. "Serious non-homicide crimes may be devastating in their harm but in terms of moral depravity and of the injury to the person and to the public they cannot be compared to murder in their severity and irrevocability." *Graham*, 560 U.S. at 69 (internal punctuation and citations omitted).  Thus, "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Id.*

The average sentence for murder is about 20 years and two months.  U.S. Sentencing Commission, Quarterly Data Report at Table 6 (2016).[2]  Indeed, even amongst those who commit murder, which the Supreme Court has observed is inherently the most serious of all

_____

[2] Available at:  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_4th_16_Final.pdf

crimes, only 21% receive a sentence of life.  U.S. Sentencing Comm'n, *Life Sentences in the Federal System* [*Life Sentences*] at 5 (Feb. 2015).[3]

Here, Jarratt Turner has accepted responsibility for committing these horrible acts upon the two children. Although his actions were heinous, Jarratt Turner still did not murder anyone. Moreover, he has pled guilty, which is the type of behavior that typically supports a 30% reduction in a sentencing range under the Guidelines.  The Court should, accordingly, grant him a sentence that is roughly 30% shorter than a sentence that would extend to his expected life span.

### D.        Public Safety and Deterrence

Here, the Court must also consider public safety and deterrence when fashioning a just sentence. Jarratt Turner understands this function of the Court and submits that a sentence in prison for 30 years would appropriately address such concern. A long sentence of 30 years will effectively protect the public for the next three decades. Furthermore, a sentence of 30 years is sufficient to provide specific deterrence.

Age is certainly a factor that affects recidivism. When the Court evaluates public safety, recidivism is an appropriate consideration. All of the evidence indicates that the risk of sexual recidivism declines with age. Even for child molesters released after age sixty, the recidivism rate is very low (3.8%). See R. Karl Hanson, Recidivism and Age: Follow–Up Data From 4,673 Sexual Offenders, 17 J. Interpersonal Violence 1046, 1059 (2002).  By the time Turner were to

---

[3] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20150226_Life_Sentences.pdf.

have served a sentence of, for example, 30 years, he would be in his sixties and much less likely to re-offend.

Jarratt Turner plans to take all of the therapy and sex offender treatment that is made available to him both during and after prison. As discussed earlier, an aged Jarratt Turner is much less likely to re-offend. Jarratt Turner is even less likely to re-offend if he receives treatment in prison.  See, e.g., Grant Duwe & Robin A. Goldman, The Impact of Prison-Based Treatment on Sex-Offender Recidivism: Evidence from Minnesota, Sexual Abuse: A Journal of Research and  Treatment, vol. 21, No. 3 (September 2009) (confirming effectiveness of cognitive-behavioral treatment for sex offenders in prison setting) (attached as Exhibit 1). The majority of studies analyzing the effectiveness of sex offender treatment have confirmed its benefits. Studies report that treated sex offenders have a sexual recidivism rate 37% lower than control groups receiving no treatment. Friedrich Losel & Martin Schmucker, The Effectiveness of Treatment for Sexual Offenders: A Comprehensive Meta-Analysis, JOURNAL OF EXPERIMENTAL CRIMINOLOGY, at pp. 127-28 (2005) (attached as Exhibit 2).

Indeed, the United States Government, through the Bureau of Prisons (BOP), has a complete system set up to assist persons convicted of sexual crimes such as Jarratt Turner. The BOP Sex Offender Management Programs (SOMP) are designed to evaluate risk, provide specialized treatment, and provide transition services for an inmate when released back into the community.  The BOP begins the treatment process with an in-depth evaluation. "SOMP Psychologists and Treatment Specialists perform specialized assessments of sexual offenders. These include risk assessments and diagnostic assessments."  BOP Sex Offender Program

Statement found at https://www.bop.gov/policy/progstat/5324_010.pdf (attached as Exhibit 3). The initial evaluation includes self-report history, medical records, and the PSR. The evaluation process seeks to determine the risk of sexual recidivism, treatment needs, and the need for a correctional management plan. "The Initial Risk Assessment is a provisional determination of risk used to guide treatment and management decisions. SOMP staff rely on actuarial risk assessment measures coupled with consideration of other clinically relevant factors associated with risk." (*Id*. at 8)

After an evaluation, the BOP considers all relevant factors and seeks to provide an effective treatment program. "The Bureau is committed to providing evidence-based psychology treatment programs to sexual offenders. Sex offender treatment programs, like all Bureau psychology treatment programs, are designed on the most recent research and evidence-based practices, ensuring effective treatment programs." (*Id* at 14).

The treatment plan is designed to address each inmate's needs and risks. According to the BOP, "treatment is most likely to be effective when the intensity of services is matched to the inmate's risk of sexual or criminal recidivism. Risk assessment will be conducted prior to placement into treatment to ensure the inmate receives a level of programming commensurate with his/her treatment needs." (*Id*. at 14) Therefore, the government's team of psychologist and treatment providers seek to use the most effective practices that have been tried and true. Similarly, the government's team will be versed on the latest treatment methods and the most effective means to address an inmate's specific needs. This type of treatment program will

14

further reduce Jarratt Turner's risk of re-offending, while also helping him to understand the psychological factors that led to his wrongful act.

Another component of the BOP's program is the Individualized Treatment Plan. "SOMP staff develop individual Treatment Plans for each participant, considering risk and diagnostic factors. To assist participants in achieving their treatment goals, staff select clinical interventions that are consistent with the concepts presented in the program journals." (*Id* at 15). As stated earlier, Jarratt Turner plans to volunteer and sign up for all sex offender and psychological programming made available to him. An Individualized Treatment Plan, set up by the government's own team of psychologists and treatment providers is the exact type of treatment that would reduce Jarratt Turner's risk of reoffending.

In addition to an Individualized Treatment Plan, BOP and government professionals monitor each participant's progress. "Treatment programs periodically evaluate participants' progress toward achieving treatment goals by ensuring that skills learned in treatment are practiced and generalized to various settings. Completion of treatment programs is based on a clinical assessment of the participant's success in the application of program concepts in his/her daily life." (*Id* at 15). Monitoring progress or lack thereof, allows government treatment providers to adjust the treatment plan to match the intensity of the participants' needs and risks.

The government's BOP treatment plan also Targets Criminogenic Needs. "Treatment programs implement interventions that target criminogenic needs, such as offense-supporting beliefs, to reduce the likelihood of misconduct and recidivism. Treatment programs identify

and target the criminogenic needs most directly linked to each inmate's offending behavior." (*Id* at 15). This effective tool allows psychologists to address nuanced beliefs or misunderstandings that a participant used to rationalize his wrongful actions. By addressing these concerns head on, the BOP program is likely to be more effective, thus reducing Jarratt Turner's risk of recidivism.

BOP also uses Cognitive Behavioral Therapy to assist participants. CBT is a solution-based model that can be used to address various destructive behaviors. The BOP has chosen this method because of its success rate in other inmate populations. (*Id.* at 15)

Understanding the treatment process, the BOP has developed three phases for treatment. Phase I is the orientation where participants develop basic cognitive-behavioral skills and begin to discuss their offense conduct in individual and group settings. (*Id* at 18). In Phase II, participants learn to apply the productive skills that they have been taught from government professionals. Phase II also monitors progress by determining whether a participant is self-disclosing in a manner that allows growth. While in Phase II, participants are placed into small Process Groups of no more than 12 participants. The smaller group permits a greater level of self-disclosure, in the interests of achieving full description of each participant's sexual offense conduct." (*Id* at 19). Phase III, also known as the Transition Phase, seeks to provide participants with various contextual opportunities to use the skills that they have learned in the previous phases.

Jarratt Turner plans to take full advantage of every psychological and sexual offender programs that are available to him. As discussed above, the BOP has a thorough program that

has been developed and implemented by its team of government psychologists and treatment providers. The SOMP considers an offenders' self-disclosure, medical records, and PSR, to begin its analysis. The BOP then uses risk assessment and other factors to determine the level of intensity. After a thorough evaluation, participants are taught skills to change their destructive behavior. Jarratt Turner will benefit from the BOP Sex Offender Management Program, which will significantly lower his recidivism rate.

Assuming Turner can live through his sentence, Turner will be under federal supervision for the rest of his life. That will certainly entail sex-offender counseling, as well as restrictions that ensure he has no unapproved access to minors. Those interventions, along with his age, will go far in ensuring that Turner will not recidivate.

### E.     A Sentence of 30 Years is Appropriate

Here, Jarratt Turner has no criminal record. Furthermore, he accepted responsibility for his actions by pleading to every single count of the indictment instead of proceeding to trial, which would have created additional pain for the victims and their families. This should be contrasted against cases where a defendant was sentenced to 30 years after proceeding to trial. *United States v. Sanchez*, 440 F. App'x 436 (6th Cir. 2011) (reporting 30-year sentence for defendant who sexually abused his daughter from age 6 to 12; had prior conviction for molesting stepson; and was convicted at trial) *Doe v. Cotterman*, 2018 U.S. Dist. LEXIS 38794 (N.D. Ill. March 9, 2018) (recounting 35-year sentence for defendant who sexually abused girl from age 4 to 8 and was convicted at trial); *United States v. Dotson*, 715 F.3d 576 (6th Cir. 2013) (reporting 22-year sentence for defendant who sexually molested girlfriend's four-year-old

daughter and was convicted at trial); *United States v. Levy*, 385 F. App'x 20 (2d Cir. 2010)

(reporting 30-year sentence for defendant who sexually molested girlfriend's five-year-old

daughter and was convicted at trial); *United States v. Street*, 531 F.3d 703 (8th Cir. 2008)

(affirming 30-year sentence for defendant who molested daughter and step-daughter for years

and was convicted at trial).

## IV.     Conclusion

Jarrett Turner respectfully requests a sentence of 30 years.  That sentence is extremely

harsh.  It is only about 30% shorter than his expected life span, but that small bit of leniency is

well deserved given XXXXX that Turner has pled guilty and has fully and remorsefully

accepted responsibility for his behavior.

Respectfully submitted,

s/ *Dumaka Shabazz*
DUMAKA SHABAZZ
Assistant Federal Public Defender
810 Broadway, Suite 200
Nashville, Tennessee 37203
 615-736-5047
Dumaka_shabazz@fd.org

Attorney for Jarrett Turner

CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2018, I electronically filed the foregoing **Redacted**
Sentencing Memorandum with the U.S. District Court Clerk by using the CM/ECF system,
which will send a  Notice of Electronic Filing to the following: S. Carran Daughtrey, Jason E.
Ehrlinspiel, and Debra Teufel Phillips, Assistant United States Attorney,  110 Ninth Avenue
South, Suite A-961, Nashville, Tennessee, 37203.

s/ *Dumaka Shabazz*
DUMAKA SHABAZZ