IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

UNITED STATES OF AMERICA,  )
           )
v.                  )     Case No: 3:15-cr-00093
           )     Judge Aspen
JARRATT A. TURNER     )

UNITED STATES' SENTENCING MEMORANDUM

      The United States of America requests this Court impose a substantial sentence of incarceration for the defendant's egregious conduct. Not only did this defendant molest and produce sexually explicit images of an infant boy and toddler girl, whose parents had entrusted to his care, but he also distributed these recordings to numerous strangers, talking to them about his sexual molestation of these children. Additionally, he made efforts to conceal his identity by using only public Wi-Fi connections to distribute these images and videos of the two children, one of whom he called by name. This defendant is a dangerous predator who has adversely affected the life of these two children and their respective families, and he should not be given the opportunity to engage again in such despicable behavior. The 120-year sentence recommended by the U.S. Probation Office is a sufficient but not greater than necessary sentence that reflects the goals of 18 U.S.C. § 3553(a).

Background

      As reflected in the presentence report ("PSR"), the defendant befriended families in the Nashville area, and after gaining their trust, offered to babysit their children at his home, a basement apartment in Nashville, Tennessee. Turner had known one of the families for a number of years. Unbeknownst to the parents of a female toddler (hereinafter "Nija") and a male infant (hereinafter "Adam"), Turner recorded sexually explicit images of these children, including of

1

himself physically molesting the children. He then traded these images and videos online with other like-minded individuals, representing himself to be the father of Nija and the uncle of Adam, although he is not related to either individual. Turner used his personal smart phones (two Samsung Galaxy cellular telephones) to record the sexually exploitation of these young children in his residence and at a local Walmart. He then shared numerous images and videos of Nija and Adam on the internet with like-minded individuals. In an effort to avoid identification by law enforcement, however, he accessed his email, nijasdad@inbox.com, only from locations with publicly available Wi-Fi connections. Turner used this email account exclusively for the trade and discussion of child exploitation images, and at the time of his arrest, the email account had over 450 emails sent and received. Turner also posted the images on a website that commonly is used to share sexual exploitation images of children. He stored his child pornography on five different electronic devices, including two phones and three tablets, which were found to contain 3039 images and 57 videos of the sexual exploitation of children. PSR ¶¶ 4-11.

Homeland Security Investigations agents received a referral from a Queensland Police Service (QPS) law enforcement officer who had exchanged emails with Turner, and with the help of the manager of a coffee shop[1] where Turner regularly accessed their free Wi-Fi internet connection. PSR ¶¶ 5, 6, 9. The HSI agents also contacted adults that were associated with the photos of the children found on the Facebook pages, and the families subsequently confirmed the identity of their children, as well as their friendship with Turner, to whom they had entrusted their children for babysitting. The girl had been born in October of 2012, and the boy had been born in

---

[1] That individual, who had nothing more to do with this case, has continued to maintain contact with the undersigned to track the proceedings in this case.

September of 2013. One mother had been very close to Turner for years and was able to identify the background in some photos as being in his residence. PSR ¶¶ 9-10.

Turner was immediately arrested and taken into custody. A simultaneous search (pursuant to a search warrant) of Turner's residence confirmed that many of the images and videos had been recorded in his bedroom and bathroom, as they show the same walls, floor, dog bed, and bed comforter found in the apartment. Other images of Nija had been recorded in a changing room in a local Walmart. The electronic items found on Turner's person and collected from his residence that were later found to contain child exploitation images and videos include as follows: Samsung Galaxy S6 (Phone), Model – SM-G920P; Samsung Galaxy S3 (Phone), Model – SGH-T999; Next Tablet, Model – NX785QC8G; Samsung Galaxy Tab3 (Tablet), Model – SM-T217S; and ASUS Tablet, Model – ME173X. These devices contained 3039 images and 57 videos depicting the sexual exploitation of children. PSR ¶ 11. Additionally, an HSI Intelligence Analyst was able to pull detailed fingerprints from images of the adult male as he was separating the female toddler's labia for the camera; the prints in the images matched those of Turner. PSR ¶12n, fn 2.

A review of the evidence indicates that Turner sexually abused "Nija," from the age of 23 months to 31 months. He recorded video and images of her nude and of himself sexually molesting her during at least 10 different days. The images and videos Turner took of her include his rape of her, vaginally and anally, including one video in which she clearly is uncomfortable. Additionally, Turner took images of "Adam," from the age of 12 months to 17 months, on at least 10 different days. Those images also include Turner anally raping the boy.

3

Turner was charged with 16 counts of Production of Child Pornography, in violation of 18 U.S.C. § 2251(a), and one count of Transportation of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(1). D.E. 11: Indictment. The basis for each of the counts charged is as follows:[2]

Count 1:   On October 4, 2014, Turner recorded an image of an infant boy ("Adam," age 12 months at that time) touching his own genitalia.

Count 2:   On October 5, 2014, Turner recorded an image of Adam, naked on a blue comforter on the linoleum floor of Turner's bathroom.

Count 3:   On October 11, 2014, Turner recorded an image of a toddler girl ("Nija," age 23 months at that time) with the focus on her exposed genitalia and his erect penis very close to her vaginal area.

Count 4:   On October 31, 2014, Turner recorded an image of Adam, naked on a blue patterned comforter with ejaculate on his genital area, legs, and stomach.

Count 5:   On November 14, 2014, Turner recorded multiple images of Nija lying on a dog bed in Turner's bathroom with her genital area exposed. In some images, the defendant has his penis on or in her vagina and is ejaculating on her in the last image in the series.

Count 6:   On December 6, 2014, Turner recorded multiple images of Adam on the defendant's bed. In some images, the child is holding the defendant's penis, with the tip in or near his mouth. In two other images, the defendant is penetrating the baby's anus and the baby has ejaculate on his back.

---

[2] The defendant has not contested the descriptions of the images and videos in the PSR, and as such, the United States does not plan to introduce them into evidence at sentencing unless the Court believes it is necessary to have them entered into the record. In lieu of introducing the child pornography into evidence, the United States sets forth the descriptions of the produced child pornography herein.

4

Count 7:   On December 7, 2014, Turner recorded two images of Adam. In one image, Adam is lying naked next to the defendant on the defendant's bed with his penis and bottom exposed. In another image, the baby is sitting up with the focus of the image on his genitalia.

Count 8:   On December 20, 2014, Turner recorded an image of Nija standing naked with the focus of the image on her genitalia, in the defendant's bedroom.

Count 9:   On February 28, 2015, Turner recorded an image of Adam with the focus on his genital area and with the defendant's hand on the child's stomach just above the little boy's penis.

Count 10:  On March 21, 2015, Turner recorded an image of Nija propped up on the dog bed in the defendant's apartment, with the focus of the image on her genital area and the tip of the defendant's penis at the edge of the image, just a few inches away from the girl's genitals.

Count 11:  On April 13, 2015, Turner recorded one image of Nija holding his penis with two hands. He also took numerous images of Nija on a changing table in Walmart with the focus on her genitalia.

Count 12:  On April 19, 2015, Turner recorded an image of Nija sitting on the dog bed in the defendant's apartment holding his penis with both hands.

Count 13:  On April 20, 2015, Turner recorded multiple images of Nija on a changing table in Walmart, including images and a very short video of himself touching the little girl's genitalia and spreading her labia.

Count 14:  On May 18, 2015, Turner recorded an image of Nija lying on the blue patterned comforter in the defendant's apartment as she is holding a small green vibrator near her

5

vaginal area, with her legs spread wide apart. He also recorded a video of her playing with the sex toy near her genitalia and his penis, and of himself digitally penetrating the little girl's vagina.

Count 15: On May 21, 2015, Turner recorded two videos of himself masturbating, penetrating the genitalia of Nija approximately three different times, and then ejaculating on her abdomen. He also recorded an image of himself spreading her labia, which included clear enough fingerprints that they were examined and determined to match his own.

Count 16: On May 23, 2015, Turner recorded a long video of himself sexually molesting Nija, penetrating her vagina and anus with a vibrator, penetrating her vagina area with his fingers, and masturbating close to her face. The young child's expression during the penetration clearly indicates discomfort.

Count 17: From April 14, 2015, to May 25, 2015, the defendant used his "nijasdad@inbox.com" email account to send, via the Internet, a significant amount of the sexually explicit material he had produced to at least four individuals, one of whom was the QPS undercover investigator. Within the emails, he often made comments about the type of child pornography that he wanted to collect, such as "I have quite a bit of stuff but am really looking for hc [hard core] boys and girls in the 2-7 year old range preferably 2-5 really."

PSR ¶ 12. On March 17, 2017, the defendant pleaded guilty to the indictment. D.E. 82: Plea Petition.

<u>Appropriate Sentence</u>

This Court is now tasked with imposing a sentence that is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. §3553(a)(2). The United States submits that consideration of these factors as a whole supports a sentence that ensures this defendant never has the opportunity to abuse another child, given the egregious nature of the defendant's criminal behavior and the dire results for the sexually abused children and their families. A sentence of 120 years of imprisonment would accomplish the goals set out in 18 U.S.C. § 3553(a).

I.     <u>Nature of the Offenses</u>, 18 U.S.C. § 3553(a)(1)

Pursuant to 18 U.S.C. § 3553(a)(1), this Court should consider the nature and circumstances of these offenses. The Eleventh Circuit, sitting *en banc,* has held that "[c]hild sex crimes are among the most egregious and despicable of societal and criminal offenses." *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010). Production of child pornography, particularly with such young children, is a heinous crime that can have long or life-lasting effects on those children and their families, especially when the recording accompanies the repeated sexual penetration of the children. Furthermore, the distribution of these recordings perpetuates the abuse as images and videos can never be recovered. At least one sex offender has been found to be in possession of images and videos of Nija, whose series has been named "MaizeM," See Sentencing Hearing Exhibit #1 (attached). As they grow older, these children are likely to wonder how many people have seen these humiliating images and videos or if anyone recognizes them. For example, one victim depicted in an image found in Turner's collection of child pornography describes his experience:

7

The aspect of my victimization that is hardest to deal with is the child pornography. . . . The fact that my images are out there, and are being shared every day, is something that I think about and have to deal with every day of my life. Since learning about the widely shared pornography, I have experienced negative changes in my life, my personality, my outlook on life and the world, and my ability to trust and interact with people. One of the main issues I deal with is anger—especially to male strangers. I am naturally suspicious, even when I see people in the grocery stores or walking around my community. I fear that someone has viewed the pornography showing my abuse. I fear that I will be recognized. I struggle with extreme anger and trust issues. Some of this anger has lead me to act out aggressively—sometimes to strangers, other times to family members, friends and even though [sic] who are just trying to help me. I find it difficult to regulate my hatred, suspicions, and fears. Unfortunately, to cope with my anger and to deal with the knowledge of my abuse being looked at—probably on a daily basis—I also turn to other destructive diversions such as drugs and alcohol. How else can someone live with what is happening to them over and over again? Through some therapy, I am trying to learn other coping skills but it is hard and it is a daily struggle.

This excerpt from a victim impact statement makes clear how difficult it could be for Nija and Adam in the future.

Indeed, in the late 1990s, the Kaiser Permanente San Diego Health Appraisal Clinic, a primary care clinic where more than 50,000 adult members of an HMO receive medical examinations, began a study to examine the long-term relationship between Adverse Childhood Experiences (ACEs) and a variety of health behaviors and health outcomes in adulthood. First, they took a survey of adults who were members of the Kaiser HMO to determine the number of ACEs experienced. An ACE was defined to include an experience occurring to the adult before the age of 18, such as verbal abuse, physical abuse, contact sexual abuse, a battered mother, household substance abuse, household mental illness, incarcerated household members, and parental separation or divorce. The survey data was collected in 1995-1997.

In early 2009, using the National Death Index mortality data, researchers analyzed how many of the 17,337 original survey respondents were deceased 10 years after the survey. The results were startling. "People with six or more ACEs died nearly 20 years earlier on average than

those without ACEs." David W. Brown, et al, *Adverse Childhood Experiences and the Risk of Premature Mortality*, 37 American Journal of Preventive Medicine 389-96 (2009) (attached as Exhibit #2). In other words, if a person in the control group lived to 79.1 years old, that same person will only live to age 60.6 years old if he experienced six or more ACEs before the age of 18. This statistic is shocking.

While it is certainly alarming to know that serious negative experiences in childhood could be correlated with such a precipitous drop in life expectancy, the ACE Study expressly observed that "[t]here are several reasons to believe that these estimates of the relationship between ACEs and premature death are *conservative*." *Id.* at 394 (emphasis added). Indeed, when the initial survey was conducted in 1995-1997, approximately 60% of the survey respondents were already 50 years or older. Given that fact, "it is reasonable to postulate that people who are exposed to ACEs (particularly multiple ACEs) are more likely (compared to those who are unexposed) to be aborted; to die during childhood or young adulthood; to be institutionalized; or to be otherwise lost prior to the initiation of the ACE Study." *Id.* at 394-95. In addition, the survey respondents were of a population who were enrolled in a major health plan at that time, i.e., "predominantly white, middle-class adults." *Id.* at 394. Due to these facts about the survey population, "the association between ACEs and premature all-cause mortality would be biased downward." *Id.* at 395. In other words, it is reasonable to conclude that an ACE victim's risk of premature mortality is even greater than the ACE Study results show, especially if the victim is already of a minority group, such as Victim-1.

Additional research using the same survey data has drilled deeper to better understand the relationship between the severity of the childhood *sexual* abuse (not just adverse childhood experiences) and long-term health and social problems. *See* Shanta R. Dube, et al, *Long-Term*

9

*Consequences of Childhood Sexual Abuse by Gender of Victim*, 28 American Journal of Preventive Medicine 430-38 (2005). First, the study bifurcated the population of sexual abuse victims by classifying them into "sexual abuse, no intercourse" and "intercourse." Intercourse was defined as answering "yes" to the question of whether any "adult, relative, family friend, or stranger ever" attempted or actually had "any type of sexual intercourse with you (oral, anal, or vaginal)."

Using those definitions and categories, the study showed that adult men, who were sexually abused in the form of intercourse as a child, were *240% more* likely to attempt suicide than men who had never been sexually abused as a child. *See id.* at 432, Table 4. Equally unsettling was that even the children who experienced non-intercourse sexual abuse (so-called "just fondling") were 80% more likely to attempt suicide than those who had never been sexually abused. Sadly, this data set does not (because it cannot) include *actual* suicides, which undoubtedly would increase the odds described in the study. In addition to suicide risk, intercourse male child sexual abuse victims were *80% more* likely to use illicit drugs ("street" drugs, e.g., meth, heroin, cocaine), and 50% more likely to have alcohol problems. *See id.*

The scientific articles interpreting the ACE Study very clearly demonstrate the profound long-term consequences of various kinds of adverse childhood experiences, especially childhood sexual abuse. Nija and Adam, who were exposed to repeated sexual abuse by Turner, now have a significantly increased risk of attempting suicide, using illicit drugs, and developing alcohol problems. Finally, there is an increased chance that they will die 20 years early, all because the defendant repeatedly chose to use them as sexual objects for his own base gratification and the gratification of countless others who received depictions of this abuse. In short, the defendant has forever affected these children's lives in ways that have significant long-term health consequences, and thus his abuse of these children will redound to their detriment in profound ways. Therefore,

10

a sentence of that amounts to life would be both reasonable and appropriate—"just punishment" in § 3553(a) language—given the lifelong consequences these children will likely experience due to the defendant's repeated and reprehensible acts.

II.    Defendant's History and Characteristics, 18 U.S.C. § 3553(a)(1)

Pursuant to 18 U.S.C. § 3553(a)(1), this Court also should consider the defendant's history and characteristics. In this case, the defendant groomed the families of the infant and toddler, one for a number of years. Once he gained their trust, he offered to babysit the children. While babysitting the preverbal children, who certainly could not report what was happening to them, he recorded his rape of them on multiple occasions. Additionally, the defendant purposely sought access to other vulnerable children, by dressing as Spiderman when washing windows at a local children's hospital, during the time he was raping these two children at his home. PSR ¶ 208; Exhibit #3. While Turner has no criminal history, his rape and abuse of these children occurred at least 16 times over a period of about seven months. Given the severe nature of his actions, common sense tells us that the defendant's sexual interest in children and this kind behavior did not occur for the first time on October 4, 2014, when the defendant was 33 years old, but likely happened long before October 2014. That interest will not magically disappear after he serves 30 years.

The defendant, however, seeks to mitigate his culpability and the severity of this crime in two ways, first claiming prior abuse as a child and arguing that had he not been abused in childhood, he probably would not have committed these crimes. The defendant cites courts that have found criminal acts attributable to childhood adversity to be mitigating factors at sentencing, finding that they might be less culpable for the choices they make as young adults. Additionally, the defendant attributes his own mental illness as part of the reason for his offense and his inability

11

to correct his behaviors without serious intervention. D.E. 96: Defendant's Sentencing Memorandum, at 8-11. While the defendant's history is unfortunate and may be considered as mitigating factors, it does not outweigh the seriousness of his crimes and the need for a substantial sentence.

a.  *Prior Abuse*

The defendant seeks mitigation by referencing his having been sexually abused as a child, something that he did not tell anyone until long after his arrest. PSR ¶ 216. Turner's explanations for his perpetrating the abuse against this baby and toddler, however, should carry little weight. "The victim-offender cycle in male sexual abuse has been popularized as an explanation of why some males sexually offend. However, there are serious limitations to this explanation…" Lambie, Ian et al., "Resiliency in the victim-offender cycle in male sexual abuse" in *Sex Abuse: A Journal of Research and Treatment* 14(1) (2002) at 43. *See also* Glasser, M. et al., "Cycle of child sexual abuse: links between being a victim and becoming a perpetrator" in *The British Journal of Psychiatry* 179 (2001) at 488 (noting that "the data do not provide strong support for a cycle of sexual substantial proportion of male perpetrators"); and Briggs, F. and R. Hawkins, "A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who Were Sexually Abused in Childhood and Claimed to be Nonoffenders" in *Child Abuse & Neglect* 20(3) (1996) at 230 (concluding that "[S]exual abuse at particular ages and frequency of abuse do not of themselves necessarily lead to an increased likelihood of perpetuating abuse across generations."). Moreover, with respect to studies that have suggested that "prior victimization may have some effect in a minority of perpetrators . . . [a]nother possibility is that some sexual perpetrators may feign sexual victimization in order to gain sympathy, preferential treatment, or therapy." *Glasser*, at 488. *See also* Hall, R.C.W., "A Profile of Pedophilia: Characteristics of Offenders, Recidivism,

12

Treatment Outcomes, and Forensic Issues" in Mayo Clinic Proceedings 82(4) (2007) at 464 (noting that "[t]here is also legitimate concern regarding the validity of many of the self-reports of pedophiles who claim to have been abused as children themselves. These statements often are made in a legal or group treatment setting, in which pedophiles may be trying to mitigate their sentence or gain sympathy for their behavior."); Haywood, Thomas et al., "Cycle of Abuse and Psychopathology in Cleric and Noncleric Molesters of Children and Adolescents" in *Child Abuse & Neglect* 20(12) (1996) at 1234 (stating that "[s]tudies into prevalence of childhood sexual abuse among sex offenders have produced mixed results with 8% to 60% of child molesters reporting having been sexually abused as a child. Variability in prevalence rates across studies may be due in part to differing motivations on the part of subjects to give self-serving histories. . .") (citations omitted); and Briggs & Hawkins, at 232 (noting that "[p]erpetrators may lie about their actions or attempt to excuse their behavior by pointing to their own victimization as children. . . Excuse-making may be more prevalent in settings where such behavior may be useful, such as in the early stages of therapy (before learning that excuse-making is not acceptable) or during the trial process (perhaps under the guidance of enthusiastic defense lawyers)."). Interestingly, "when verified by polygraph…the percentage of offenders who experienced sexual victimization in their own lives drops significantly." Hindman, Jan et al., "Shedding Light on the Histories of Sex Offenders Using Clinical Polygraphy" in *The Sexual Predator* (vol. IV) (2010) at 20-5. *See also* Hindman, Jan et al., "Polygraph Testing Leads to Better Understanding Adult and Juvenile Sex Offenders" in Federal Probation 65(3) (2001) at 8.

In this case, however, the defendant's allegations have not been subjected to a polygraph, and even the defendant's mother adamantly denied the defendant's claims. PSR ¶216. As such, this defendant's unverified report as a victim of prior sexual abuse should be given little weight.

13

Even if this Court were to consider the childhood abuse, such experiences, while clearly unfortunate and disturbing, simply should not mitigate the later abuse of children. *See, for example, United States v. Grigsby*, 749 F.3d 908, 909 (10th Cir. 2014) (upholding a 260-year sentence, discounting the defendant's difficult childhood as outweighed by the harm he had caused).

b.   <u>*Mental Illness*</u>

The defendant also submits that his mental illness (depression and bipolar disorder) should be a mitigating factor because it was "part of the reason for his offense and his inability to correct his behaviors without serious intervention." D.E. 96: Defendant's Sentencing Memorandum, at 11. The defendant, however, has presented no evidence at this point that his mental illness contributed to his offenses. The United States does not contest that the defendant has serious mental illness but is concerned that the mental illness might well make re-offense more likely, as stated by the defense. This argument cuts both ways, which may explain the sentencing guideline prohibition of using diminished capacity as a reason to depart from the guidelines in production cases. U.S.S.G. § 5K2.13. Further, at least one court has declined to consider mental illness as a mitigating factor. *See, for example, United States v. Starko*, 735 F.3d 989, 992-93 (7th Cir. 2013) (finding no procedural error when the district court found that there was no connection between the defendant's mental illness and the crimes of conviction).

III.   <u>Need for Sentence Imposed to Reflect the Seriousness of Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense</u>, 18 U.S.C. § 3553(a)(2)(A)

In determining the appropriate sentence, this Court also should consider, pursuant to 18 U.S.C. §3552(a)(2), the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. The 30-year sentence suggested by the defendant, however, simply would not reflect the seriousness of these offenses.  Nor would such

14

a sentence promote respect for the law or provide just punishment for a man who has molested two very young child in his custody, produced sexually explicit material of those children, distributed that material, discussed his molestation of the children, and collected recordings of the sexual exploitation of other very young minors. A sentence of at least 120 years, however, would accomplish the goals of reflecting the seriousness of these crimes, promoting respect for the law, and providing a just punishment.

IV.    <u>Affording Adequate Deterrence to Criminal Conduct</u>, 18 U.S.C. § 3553(a)(2)(B)

Given that collection of child pornography has become so prevalent, it is imperative that a sentence be imposed for the *production* of sexually explicit material that will afford adequate deterrence to such criminal conduct and will promote future lawful conduct, pursuant to 18 U.S.C. § 3553(a)(2)(B).  Indeed, Congress, the Supreme Court, and the Sentencing Commission believe that general deterrence for trafficking in child pornography is a very important factor when considering an appropriate sentence in distribution, receipt, and possession cases. *See United States v. Irey*, 612 F.3d 1160, 1210-11 (citing *United States v. Ferber*, 458 U.S. 747, 760 (1982); *Osbourne v. Ohio*, 495 U.S. 103, 109-10 (1990) (holding that "[i]t is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand")); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) (stating that "[t]ransporting and receiving child pornography increases market demand. The greater concern under the Guidelines is for the welfare of these exploited children. The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it."); *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007) (noting that "[s]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it

15

made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced"). In *United States v. Bistline*, the Sixth Circuit reversed the district court for failing to see any importance in general deterrence for a defendant who had collected child pornography. 665 F.3d 758, 767 (6th Cir. 2012). The district court in that case stated, "general deterrence . . . will have little [if] anything to do with this particular case." *Id.* The Sixth Circuit found that the district court's statement was "inexplicable and in any even conflicts with our statement that 'general deterrence is crucial in the child pornography context.'" *Id*. (citing *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010)).

In this case, the defendant not only collected child pornography, but he also produced and distributed the produced images, behavior that warrants even greater deterrence. The defendant's multiple recordings of his raping these two very young, preverbal children are abhorrent. Under these circumstances, it is important that the sentence in this case provide a deterrent for *this* defendant. Additionally, a sentence of 120 years would provide a generic deterrence by sending a strong message to the community that the recording and distribution of the sexual assault of very young children will be punished harshly.

V.     Protection of the Public from Further Crimes of Defendant, 18 U.S.C. § 3553(a)(2)(C)

In determining the appropriate sentence, this Court also must consider the need to protect the public from further crimes of the defendant, pursuant to 18 U.S.C. § 3553(a)(2)(C). In this case, the defendant produced exploitive material of two very young children on at least 16 occasions. He discussed his sexual exploitation of the children and distributed the material, some of which has been identified in another offender's collection. Turner also distributed this material

16

in exchange for sexually explicit materials of equally young children. These factors are indicative of the serious danger this man presents to the community. He should be sentenced to a sufficiently long sentence that he will never again have the opportunity to abuse another child.

In his discussion of public safety and deterrence, the defendant argues that this Court should consider recidivism, stating that age is a factor that affects recidivism and citing a couple of studies. Focusing on "recidivism rates," however, is misleading for a number of reasons. The reality is that sex offenders can perpetrate sexual abuse throughout their life, even as they grow older. *See, for example, United States v. Hans Bartsch*, 3:10-cr-00300, Middle District of Tennessee (involving 72-year-old man traveling from Canada to have sex with a fourteen-year-old girl in Tennessee). Additionally, relying on recidivism rates as an indicator of future risk depends on crimes being reported and successfully prosecuted. The United States Sentencing Commission, Report to Congress: Federal Child Pornography Offenses (Dec. 2012),[3] has reported that recidivism rates "necessarily underreport offenders' actual rate of recidivism," since they are based on arrests and/or convictions. (Sent. Comm. Report, p. 294). Even when recidivism is based on convictions and/or arrests, the rates tend to increase over time. *See, for example*, Ecke, Seto, and Williams, *Examining the Criminal History and Future Offending of Child Pornography Offenders: An Extended Prospective Follow up Study*, Law and Human Behavior (2011), 466-478 (concluding that the longer a child pornography offender is in the community, the greater the likelihood that he will be caught reoffending). In fact, the low levels of arrest rates should not be surprising. Unlike other offenders, child molesters do not boast about their crimes outside of their trusted circles. Furthermore, the vast majority of sex offenses committed against children go

---

[3] Available at
http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Sex_Offense_Topics/201212_Federal_Child_Pornography_Offenses/index.cfm.

unreported. *See* London, Bruck, Ceci and Schuman, *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways that Children Tell?*, Journal of Psychology, Public Policy, and Law, Vol. 11, No. 1, p. 194 (2005) (reviewing numerous studies and concluding "[t]he evidence indicates that the majority of abused children do not reveal abuse during childhood"); Sent. Comm. Report, p. 295 (reporting that sex offenses are underreported as "it is widely accepted among researchers that sex offenses against children often go unreported or undetected"); Bonta & Hanson, "Gauging the Risk for Violence: Measurement, Impact and Strategies for Change" (1994) (published by the Solicitor General Canada, Ministry Secretariat (Ottawa)) (finding that children are particularly reluctant to talk about sexual abuse); Hanson & Bussière, "Predictors of Sexual Offender Recidivism" (1996) (published by the Solicitor General Canada, Ministry Secretariat (Ottawa)). One study aimed specifically at age and sexual recidivism offered the following explanation for the data upon which defendant relies:

> The abrupt drop in recidivism for offenders released in their 60s and 70s might then reflect new variables beginning to act. These might include loss of physical health and a significant reduction in effective time at risk due to mortality. However, some reckoning must also be made with possible changes in the reporting rate. Relatives' willingness to report offending by a grandparent is likely reduced by the thought that he will probably die soon. Additionally, sexual misbehavior by the very old (for example in nursing homes) is often treated as a health problem ("poor old man, he can't help it") rather than as something to be dealt with by the criminal justice system.

Thornton, *Age and Sexual Recidivism: A Variable Connection*, Sexual Abuse: A Journal of Research and Treatment, Vol 18, No. 2, p. 12 (2006). Thus, low recidivism numbers based upon arrests and convictions are to be expected in all sex offense cases, and especially those involving older offenders. Interestingly, when compared with rapists and sexual sadists, pedophiles comprise 60% of all older offenders, indicating that pedophiles offend in their later years at a greater rate than other sexual offenders. See Ryan C.W. Hall & Richard C.W. Hall, *A Profile of Pedophilia:*

18

*Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*,

82 Mayo Clinic Proc. 457, 458 (2007).  As Judge Posner has explained:

> Statistical analysis of sex crimes has shown that *the best predictor of recidivism is not deportment at an interview but sexual interest in children*.  R. Karl Hanson, Kelley E. Morton & Andrew J.R. Harris, "Sexual Offender Recidivism Risk: What We Know and What We Need to Know," 989 Annals of the N.Y. Academy of Sciences 154, 157 (2003) (tab.1).

*United States v. Garthus*, 652 F.3d 715, 720 (7th Cir. 2011) (emphasis added).

The bottom line is that recidivism rates and statistics simply cannot representative of the danger offenders pose to the community.

Importantly, the re-offense rate (as opposed to the recidivism rate, which only tracks rearrests at best) of child sex offenders is not insignificant, according to a variety of different studies. Recidivism and Reoffense Rates of Adult Sex Offenders, Stephen Brake, Ph.D. (September 2012). Indeed, the risk is higher for those who have prior contact offenses. The United States Sentencing Commission Report indicates that offenders such as Turner are more likely to recidivate than others convicted of non-contact child pornography offenses. Specifically, the Report cites to a study that states as follows:

> "A pedophilic sex offender who has committed both a child –pornography offense and a hands-on sex crime is more likely to commit a future crime, including another hands-on offense, than a defendant who has committed only a child-pornography offense."  Drew A. Kingston et al., *Pornography Use and Sexual Aggression: The Impact of Frequency and Type of Pornography Use on Recidivism Among Sexual Offender*s, 34 AGGRESSIVE Behav.1, 9 (2008).

(Sent. Comm. Report, p. 170). In this case, Turner sexually abused very young children, discussed the abuse he had inflicted, distributed his homemade material, and collected additional child pornography that included the rape of other young children. Clearly, based on these studies cited by the Commission, Turner is at a higher risk to recidivate than is represented by his forensic examiner.

There is no doubt that this defendant is an immense danger to the community. A sentence of 30 years would not come close to achieving the sentencing goal of protecting the public.

VI.   Sentencing Guideline Range, 18 U.S.C. § 3553(a)(4)

This Court also should consider the advisory sentencing guidelines in determining the appropriate sentence, pursuant to 18 U.S.C. § 3553(a)(4). The total offense level is 53 after acceptance of responsibility, which is treated as level 43, pursuant to U.S.S.G. § 5A, application note 2 (stating that in rare cases where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43). Notably, not only is this a "rare" case in which the total offense level is above 43, but it is 10 levels above the maximum level. With a criminal history category of I, the resulting advisory guideline range is life, although it is limited by the statutory maximum of 500 years.

The defendant suggests that this Court should disregard the guideline range and impose a sentence of only 30 years. As part of his argument, the defendant criticizes the sentencing guidelines as they relate to the production of child pornography, arguing that they lack a reasoned, expert, or empirical bases, and because the guideline enhancements apply to such a large percentage of offenders that everyone is treated as if they are the worst offender. D.E. 96: Defendant's Sentencing Memorandum, at 4-5. In support of his argument that the Court should disregard U.S.S.G. §2G2.1, the defendant cites two district court cases, both of which are outside the Sixth Circuit. In contrast, the Sixth Circuit has held that sentencing judges must give child pornography guidelines substantial deference:

> Congress's power to make sentencing policy does not arise from a delegation from anyone, much less a delegation made on grounds of a particular expertise. That power flows directly from the Constitution, without strings other than those contained in the Constitution itself. And nothing in that document confines the

exercise of Congress's sentencing power to empirical grounds alone. Of course, Congress can choose to act on empirical grounds; and when it does, a district court must contend with those grounds in explaining its disagreement (in the case of a guideline) with Congress's policy judgment. But it is also Congress's prerogative to dictate sentencing enhancements based on a retributive judgment that certain crimes are reprehensible and warrant serious punishment as a result. When a congressional directive reflects such a judgment, a district court that disagrees with the guideline that follows must contend with those grounds too. Thus, when a guideline comes bristling with Congress's own empirical and value judgments—or even just value judgments—the district court that seeks to disagree with the guideline on policy grounds faces a considerably more formidable task than the district court did in *Kimbrough*.

. . . .

A court that disagrees with § 2G2.2 must take on this formidable task. Congress's long and repeated involvement in raising the offense levels for § 2G2.2 makes clear that the grounds of its action were not only empirical, but retributive—that they included not only deterrence, but punishment.

*United States v. Bistline*, 665 F.3d 758, 764 (6th Cir. 2012) (rejecting the district court's conclusion that the § 2G2.2 was "seriously flawed" because Congress exercised, rather than delegated to the Sentencing Commission, its power to set policies, and finding instead that the guidelines range was the proper starting point for Bistline's sentence). While the Sixth Circuit only has addressed the § 2G2.2 guidelines, which apply to the possession, receipt, distribution, and transportation of child pornography, application of this reasoning makes even more sense in production cases that involve the most culpable child pornography offenders. Indeed, other circuit courts have rejected challenges to § 2G2.1 for lacking an empirical basis. *See, for example, United States v. Grigsby*, 749 F.3d 908, 911 (10th Cir. 2014); *United States v. Miller*, 665 F.3d 114, 121 (5th Cir.2011). In the instant case, this defendant has failed to set forth any substantial support for why this Court should disregard the advisory guideline under § 2G2.1 other than to argue that it is not based on "empirical" data and that § 2G2.1 does not differentiate between offenders.

Even if this Court were to disregard Sixth Circuit precedent and/or buy into this defendant's other arguments, the factors pursuant to 18 U.S.C. § 3553(a) still warrant a sentence commiserate

with the advisory guidelines and certainly more than the 30 years that the defendant argues is appropriate. The government submits that a sentence that is effectively life would best satisfy the goals of 18 U.S.C. §3553(a).

VII.    Disparity in Sentencing, 18 U.S.C. § 3553(a)(6)

Defendants who have been charged with production of child pornography involving hands-on offenses of prepubescent children and have pleaded guilty, have routinely received lengthy sentences in this jurisdiction. Some of these sentences have been upheld on appeal, while others are still pending appeal. *See United States v. Daniel Green*, 608 Fed.Appx. 383 (6th Cir. 2015) (upholding 80-year sentence, the maximum possible sentence in the case, when a defendant pleaded guilty mid-trial after producing child pornography of two young girls in his custody); *United States v. Edwin Velasquez Curuchiche*, MDTN 17-5566 (6th Cir. February 23, 2018) (unpublished) (affirming 55-year sentence for production of child pornography depicting the lascivious exhibition of genitalia of a six year old neighbor child while sleeping, having snuck into the child's house uninvited; no distribution involved). *See also United States v. Richard Souders*, MDTN 3:14-cr-00164 (appeal pending, case #17-6112) (received 60-year sentence for production of child pornography of a 17-month-old relative and subsequent distribution to multiple individuals); *United States v. Ryan Day*, MDTN 3:15-cr-00197 (appeal pending, case #17-5866) (received 50-year sentence for production of child pornography of a child in his care whom he also molested her for several years until he was caught when she was about 11 years old; involved distribution of produced child pornography); *United States v. Damion Faulkner*, MDTN 3:15-cr-00101 (appeal pending, case #17-5604) (received 50-year sentence for production of child pornography depicting the lascivious exhibition of genitalia of a prepubescent child while sleeping

22

production in a case where the defendant had molested two young girls; involved distribution of produced child pornography); *United States v. Mark White*, MDTN 3:13-cr-00138 (received 35-year sentence for production of child pornography depicting the lascivious exhibition of genitalia of prepubescent child while sleeping; no distribution involved).

A review of cases nationwide that have similar facts, i.e. a babysitter recording his molestation of prepubescent children, show that courts have sentenced such defendants between 90 and 120 years, and in each case, the defendant pleaded guilty. *See, for example, United States v. Cobbler*, 748 F.3d 570, 582 (4th Cir. 2014) (upholding sentence of 120 years for a man who sexually molested a four-year-old boy on four separate occasions while babysitting him); *United States v. Speer*, Case #8-13-cr-00561-SCB-AEP-1 (MDFL) (sentenced defendant to 90 years for producing child pornography of a three-year-old child whom he was babysitting on one occasion, which child pornography he subsequently distributed); *United States v. Stewart*, Case#1:09-CR-159-TH-1 (EDTX) (sentenced defendant to 90 years for recordings of sexual abuse of three young boys that spanned six years). In *Stewart*, there was no dispute that the defendant had had a troubled childhood and mental health issues since childhood, having been diagnosed with Bi-Polar Disorder and ADHD. Case#1:09-CR-159-TH-1 (EDTX), Docket Entry 42, pages 5-6, 9 (PageID# 126-27, 130). Nevertheless, the judge sentenced the defendant to the maximum possible sentenced. Id. at 15 (PageID# 136). As such, a sentence of 120 years for this defendant who had two victims, both of whom were younger than the victims in the above-cited cases, would not be a disparate sentence.

While defendant Turner cites many cases in other jurisdictions where defendants have received sentences of 30 years and less, many other cases similar in nature have received much higher sentences that have been upheld on appeal, despite the sentences being the equivalent of life sentences. *See, for example, United States v. James Edward Stull*, WDPA #16-00125 (on

appeal) (received a sentence of 338 years after pleading guilty to a 41 count indictment charging production of images and videos, of his rape of his child from age 23 months to years old, and distribution of the produced material); *United States v. Grigsby*, 749 F.3d 908, 909 (10th Cir. 2014) (upholding a 260-year sentence by giving the maximum sentence on each count, run consecutively, when the defendant produced child pornography of his daughter over the course of 3 months; recognizing the emotional damage the defendant caused his victim, the antisocial behavior defendant had engaged in over the course of his life, and the public's need for protection from him; and discounting the defendant's difficult childhood as outweighed by the harm he had caused); *United States v. Williams*, 2013 WL 6851125 (11th Cir. Dec. 31, 2013) (unpublished) (affirming 100 year sentence); *United States v. Goodale*, 2013 WL 6847032 (8th Cir. Dec. 30, 2013) (finding life sentence reasonable for defendant who sexually abused two boys); *United States v. Hamilton*, 2013 WL 6726953 (2d Cir. Dec. 23, 2013) (unpublished) (affirming 150-year sentence after defendant pleaded guilty to 5 counts of production of child pornography, stating, "Nor are we persuaded that a life sentence in the case at bar overstates the seriousness of the offense given Hamilton's role in producing graphic child pornography by filming himself sexually abusing children as young as four years old."); *United States v. Hodge*, 729 F.3d 717 (7th Cir. 2013) (finding 115-year sentence reasonable for production and other child pornography crimes, including the abuse of a 9 year-old girl); *United States v. Herrick*, 2013 WL 275908 (6th Cir. Jan. 25, 2013) (unpublished) (finding 95-year sentence reasonable for three counts of production of child pornography for a Boy Scout camp director); *United States v. Boroczk*, 2013 WL 197709 (7th Cir. Jan. 18, 2013) (finding 70 year sentence for production was reasonable); *United States v. Cannon*, 703 F.3d 407 (8th Cir. 2013) (affirming a sentence of 70 years for sexual exploitation of a child); *United States v. Miller*, 2013 WL 4256278 (5th Cir. Aug. 12, 2013) (unpublished)

24

(upholding 70-year sentence for production and possession); *United States v. Demeyer,* 665 F.3d 1374, 1375 (8th Cir. 2012) (affirming the reasonableness of a 120-year sentence, noting that the district court had not abused its discretion in running sentences consecutive to ensure that the defendant would serve a life sentence); *United States v. Snyder*, 425 Fed. Appx. 64 (2d Cir. 2011) (upholding a 75-year sentence for 5 counts of production of child pornography as substantively reasonable); *United States v. Castillo*, 2011 WL 2014943 (11th Cir. 2011) (upholding a sentence of 130 years for 4 counts of production of child pornography and one count of possession of child pornography as substantively reasonable); *United States v. Noel*, 581 F.3d 490, 500-01 (7th Cir. 2009) (affirming an 80-year, below-guideline sentence for production and possession of child pornography); *United States v. Sarras*, 575 F.3d 1191, 1219-21 (11th Cir. 2009) (affirming as reasonable a 100-year sentence for a first-time offender who sexually abused a 13-year-old girl and produced pornographic images of the victim); *United States v. Johnson*, 451 F.3d 1239 (11th Cir. 2006) (upholding as reasonable a 140-year sentence for two counts of producing child pornography and one count of distribution); *United States v. Betcher*, 534 F.3d 820, 827-28 (8th Cir. 2008) (upholding as reasonable a 750-year sentence for a first-time offender who had taken pornographic pictures of five 8- to 11-year-old girls, including two of his granddaughters); *United States v. Johnson,* 451 F.3d 1239, 1244 (upholding the reasonableness of a 140-year sentence, within-guidelines sentence for production and distribution of child pornography).

Turner is deserving of the recommended 120 year sentence, given that he groomed two families, gained their trust sufficiently that they allowed him to babysit their very young children, recording himself sexually abusing the infant and toddler, and then distributing the images on the Internet, identifying the boy by his first name. Indeed, imposing a sentence of 120 years for this egregious of conduct would avoid disparate sentencing.

25

## Conclusion

This is a case in which the defendant deserves a sentence that is tantamount to life, so that he can never again engage in the rape of children. Although the defendant has not murdered someone, which he submits in the only crime deserving of life according, his crimes are likely to affect the two victims in a negative way for the rest of their lives, which may well be shorter in duration than life expectancy because of the trauma. Federal District Judge John R. Adams, in *United States v. Cunningham*, used a quote attributed to Nelson Mandela: "There can be no keener revelation of a society's soul than the way in which it treats its children." 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010). He continued, "[g]iven the recent statistics surrounding child pornography, we are living in a country that is losing its soul." *Id.* The defendant's request for a downward variance in this case ignores the public's revulsion and horror at the thought of someone with custody of a baby or toddler sexually abusing that child, recording it, and trading it for additional child exploitation images.

In conclusion, the United States request the defendant be sentenced to 120 years, as recommended by the U.S. Probation Office, with in itself is a significant downward variance, followed by supervised release for life. Such a sentence would be sufficient but not greater than necessary to comply with the goals enumerated in 18 U.S.C. §3553(a), including the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, the need for deterrence, and the need to protect the public from further crimes of this defendant.

Respectfully submitted,

DONALD Q. COCHRAN
United States Attorney for the
Middle District of Tennessee

s/ S. Carran Daughtrey
S. Carran Daughtrey
Assistant United States Attorney
110 Ninth Avenue South, Suite A-961
Nashville, Tennessee 37203-3870
Telephone: (615) 736-5151

CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the above styled pleading with the clerk of

the court by using the CM/ECF system, which will send a Notice of Electronic Filing to the

following: Dumaka Shabazz, Assistant Federal Public Defendant, 810 Broadway, Suite 200,

Nashville, TN 37203, on this, the 4th day of April, 2018.

s/ S. Carran Daughtrey
S. Carran Daughtrey